## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Angella Mitchell, individually and as a Representative of the Estate of Krissie Davis, <br><br> *Plaintiffs*, <br><br> v. <br><br> Islamic Republic of Iran and The Taliban, <br><br> *Defendants*. | Civil Action Case No. _____ |

## COMPLAINT

This action is brought by the Plaintiffs, Angella Mitchell, through her counsel, for her own benefit, and as a Representative of the Estate of Krissie Davis as legally entitled to assert a claim under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(c). Plaintiff, by counsel, respectfully brings this action against Defendants Islamic Republic of Iran ("Iran") and the Taliban ("Taliban"), jointly and severally, for personal injury and wrongful death resulting from acts of terrorism, alleging extrajudicial killing and the provision of material support to terrorism by Defendants. In support of this Complaint, Plaintiff alleges as follows:

## JURISDICTION, VENUE, AND CHOICE OF LAW

1.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1330(a), 1331, and 1605A, as well as the principles of supplemental jurisdiction, given the relatedness of the claims against both Defendants.

2.    Defendant Islamic Republic of Iran ("Iran") is a foreign state that has been designated by the United States as a State Sponsor of Terrorism continuously since 1984.[1]

---

[1] U.S. Department of State, (2025). State Sponsors of Terrorism. https://www.state.gov/state-sponsors-of-terrorism/.

3.     Under the Foreign Sovereign Immunities Act's ("FSIA") terrorism exception, 28 U.S.C. § 1605A, Iran is subject to suit in U.S. courts for personal injury or death caused by an act of extrajudicial killing and the provision of material support or resources for such act. *Owens v. Republic of Sudan*, No. 14-5105 (D.C. Cir. 2017).

4.     Defendant the Taliban is an unincorporated foreign terrorist organization and thus not a state, and therefore not entitled to sovereign immunity; jurisdiction over the Taliban is based on federal question jurisdiction (18 U.S.C. § 2333, providing a civil remedy for acts of international terrorism) and 28 U.S.C. § 1332(a)(2) (diversity jurisdiction), as the Taliban consists of citizens or subjects of a foreign state (Afghanistan).

5.     Additionally, 28 U.S.C. § 1605A(c) provides a private federal cause of action for U.S. nationals (and their legal representatives) against foreign state sponsors of terrorism for personal injury or death caused by, inter alia, extrajudicial killings and the provision of material support for such killings. *Owens v. Republic of Sudan*, No. 14-5105 (D.C. Cir. 2017).

6.     The claims herein are brought under this federal cause of action, as well as under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), which authorizes U.S. nationals, their estates, survivors, or heirs to sue for injuries "by reason of an act of international terrorism" in U.S. courts.

7.     The Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, defines an extrajudicial killing as an actionable and deliberate killing not authorized by a valid court judgment.

8.     Krissie Davis' death, as described below, qualifies as an extrajudicial killing within the meaning of these statutes.

9.   Iran's and the Taliban's conduct falls squarely within the terrorism exception of the FSIA. *Owens v. Republic of Sudan*, No. 14-5105 (D.C. Cir. 2017).

10.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f)(4), which provides that a civil action against a foreign state may be brought in the U.S. District Court for the District of Columbia.

11.  The ATA's venue provision, 18 U.S.C. § 2334(a), permits suit "in any appropriate district court of the United States" for actions under § 2333.

12.  Defendant Iran is a foreign sovereign, and Defendant Taliban has no residence or registered agent within any U.S. judicial district.

13.  Given these factors, and considering the national importance of combating terrorism, the District of Columbia is an appropriate venue for this action.

14.  Plaintiff's claims arise under federal law, specifically, statutes aimed at combating terrorism (28 U.S.C. § 1605A and 18 U.S.C. § 2333).

15.  These claims constitute unique federal causes of action for wrongful death, personal injury, and related torts perpetrated by state sponsors of terrorism and their agents.

16.  To the extent that any aspect of the claims must be determined by reference to state law, the law of the forum (District of Columbia) or the law of the decedent's domicile (Alabama) would apply.

17.  However, because 28 U.S.C. § 1605A(c) provides a federal private right of action, federal law controls, and Defendants' liability is established under federal statutes without the need to resort to state tort law. *Owens v. Republic of Sudan,* No. 14-5105 (D.C. Cir. 2017).

**THE PARTIES**

## PLAINTIFFS

18.    This action is brought by Plaintiffs, by and through their counsel, in her individual capacity as one legally entitled to assert a claim under the FSIA as a survivor family member, and heir of Krissie Davis, a United States citizen.

19.    Angella Mitchell, a U.S. citizen, brings this action on behalf of herself and all those legally entitled to recover for her wrongful death, including her surviving family members, to seek justice and compensation for their losses.   Angella Mitchell is a surviving family member of Krissie Davis.   Angela Mitchell was appointed personal representative of the Estate of Krissie Davis.

20.    Krissie Davis was tragically killed on June 8, 2015, as a result of a terrorist rocket attack at Bagram Airfield in Afghanistan.

21.    Krissie Davis was at the time of the acts alleged, and at all other times relevant hereto, a resident of Talladega, Alabama and a citizen of the United States.

22.    In 2015, Krissie Davis was deployed to Afghanistan as a Defense Logistics Agency ("DLA") Property Disposal Specialist.

23.    The DLA manages the end-to-end global defense supply chain, from raw materials to end user disposition, for the five military services, 11 combatant commands, other federal, state and local agencies partner and allied nations.

24.    As an employee of the U.S. Department of Defense and U.S. civilian contractor supporting military operations, Krissie Davis fell within the category of persons protected by the FSIA's terrorism exception (U.S. government employees or contractors acting within the scope of employment abroad).   *Owens v. Republic of Sudan*, No. 14-5105 (D.C. Cir. 2017).

25.    She is survived by Angella Mitchell, by her Estate, and close family members, including immediate relatives, who suffer profound grief and mental anguish from the untimely death of Krissie Davis.

26.    Defendants are jointly and severally liable to Plaintiffs for all of their damages under applicable federal law, including 28 U.S.C. § 1605A and 18 U.S.C. § 2333.

27.    Defendant Iran is a foreign sovereign state and has been designated continuously by the U.S. Department of State as a State Sponsor of Terrorism since January 19, 1984.

28.    Iran was so designated in 2015 and remains so today.

29.    Iran, at all times pertinent to this action, provided and continues to provide material support and resources to the Taliban, including funding, training, weaponry, and safe harbor, in aid and support of its violent campaign against U.S. interests and personnel in Afghanistan and the region.

30.    Iran is subject to suit under the FSIA's terrorism exception, 28 U.S.C. § 1605A, for providing material support and resources for acts of extrajudicial killing that caused the death of U.S. citizens. *Owens v. Republic of Sudan*, No. 14-5105 (D.C. Cir. 2017).

31.    Iran may be served with due process in accordance with 28 U.S.C. § 1608(a).  Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

32.    Iran's actions described herein were taken by its officials, employees, or agents while acting within the scope of their office, employment or agency, such that Iran is liable for those actions and the resulting damages under 28 U.S.C. § 1605A(c).

**DEFENDANTS**

**THE TALIBAN**

**33.**     The Taliban is a militant organization and a designated terrorist entity by multiple international bodies, including the United Nations Security Council Resolution 1267 and various national governments.

**34.**     During the relevant time period, the Taliban operated as an armed insurgency in Afghanistan, engaging in widespread acts of terrorism and violence**.**

35.     Defendant Taliban is an Islamist militant organization and a designated terrorist entity that, during the relevant time period, operated as an armed insurgency in Afghanistan.

36.     The Taliban is not a recognized state by the United States or most other nations and, as such, is not entitled to sovereign immunity or any other form of immunity in U.S. courts.

37.     This lack of recognition underscores their status as a non-state actor engaged in terrorism.

38.     The Taliban has long conducted a sustained and widespread campaign of terrorism and guerrilla warfare against United States military personnel, civilian contractors, and coalition forces in Afghanistan, causing significant casualties and instability.

39.     The terrorism and guerrilla warfare included the routine firing of rockets, mortars, and other indirect-fire weapons at U.S. bases (such as Bagram Airfield), complex coordinated attacks on military and civilian targets, suicide bombings targeting both military and civilian populations, and the use of improvised explosive devices ("IEDs") on roadways.

40.     The Taliban and associated groups often claim credit for these attacks, particularly those resulting in significant casualties to U.S. or coalition forces, as part of their public relations and propaganda efforts to bolster their image and influence.

41.     Given that the Taliban lacks a formal address and operates transnationally, service of process can be effected pursuant to Rule 4(f)(3) of the Federal Rules of Civil Procedure,

which allows for internationally agreed-upon alternate service or other means as directed by the Court to ensure adequate notice.

42.    The Taliban leadership maintained offices, training camps, and safe havens in Afghanistan, Pakistan, and, to a lesser extent, within Iranian territory, with the knowledge and acquiescence of certain elements within those countries.

43.    The Taliban's acts described in this Complaint, including the extrajudicial killing of Krissie Davis, were conducted within the scope of the Taliban's mission to wage a campaign of terrorism.

44.    The Taliban is directly liable for the damages caused by those acts under applicable federal law (18 U.S.C. § 2333(a)).

45.    The Taliban acted in concert with and received substantial material support, resources, and strategic guidance from Iran in carrying out the attack that killed Krissie Davis, thereby making both Defendants jointly and severally liable for the resulting damages.

46.    Iran's material support included funding, weaponry, and training.

## **IRAN**

47.    Defendant the Islamic Republic of Iran is a foreign state that has been designated and continues to remain designated as a State Sponsor of Terrorism since January 19, 1984, under § 1754(c) of the National Defense Authorization Act (2019), and previously § 60 of the Export Administration Act of 1979 (50 U.S.C. App. § 2405) and § 620(A) of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371).

48.    Iran, at all times pertinent to this action, provided and continues to provide material support and resources to the Taliban, in aid and support of their violent campaigns.

49.   Iran, through its direct actions and the actions of its agents, caused the death and injuries described herein, within the meaning of 28 U.S.C. § 1605A, by providing the Taliban with substantial funding, strategic direction, advanced weaponry, logistical support, encouragement, safe haven, and comprehensive training for its terrorist activities.

50.   Defendant Iran is directly and indirectly liable for the actions of the Taliban and its agents, as Iran's support was instrumental in enabling the Taliban to carry out acts of terrorism, including the attack that resulted in Krissie Davis' death.

## STATEMENT OF FACTS

### OVERVIEW OF IRAN'S MATERIAL SUPPORT FOR THE TALIBAN:

51.   Iran has actively and consistently provided material support and resources to the Taliban and associated terrorist networks in Afghanistan, despite the Taliban's Sunni fundamentalist ideology (which historically differed from Iran's Shia regime).

52.   This collaboration is driven by a shared and unwavering enmity toward the United States and its allies, overriding ideological differences in pursuit of common strategic objectives.

53.   The United States and NATO forces supplied the former Afghan government with support.

54.   Iran sought to actively undermine support to the Afghan government by consistently supplying the Taliban with significant funding, advanced weapons, comprehensive training, and secure safe havens to enable and facilitate attacks on American and coalition personnel and interests.

55.   A *Wall Street Journal* report in June 2015 (just days after Krissie Davis' death) detailed that Iranian operatives had "quietly increased [the] supply of weapons, ammunition, and funding to the Taliban," and they were even recruiting and training Taliban fighters.

56.   Iran employed a network of smugglers to deliver a wide array of arms and equipment to the Taliban, including but not limited to 82mm mortars, rocket-propelled grenades ("RPGs"), AK-47 rifles, materials for constructing sophisticated improvised explosive devices ("IEDs") and other lethal military hardware designed to inflict maximum casualties.

57.   U.S. and Afghan officials have confirmed Iran's extensive support for the Taliban.

58.   In a 2019 statement, Navy Commander Rebecca Rebarich, a Pentagon spokesperson, stated: "Iran has provided material support to the Taliban since at least 2007 when NATO forces intercepted a shipment of weapons from Iran destined for the Taliban."

59.   "Iranian support has consisted of small arms, explosives, mortars, RPGs, heavy machine guns, and 107mm rockets, in addition to training in small unit tactics and the use of weapons systems."[2]

60.   Iran also granted Taliban fighters sanctuary on Iranian soil, providing them with secure bases of operation, logistical support, and freedom of movement, and facilitated their travel to and from Afghanistan, as reported by investigative journalists and intelligence sources.

61.   The types of weapons Iran furnished to the Taliban notably included 107mm rockets, a form of indirect-fire weapon that the Taliban frequently and effectively used to target U.S. military bases and personnel in Afghanistan, causing significant damage and casualties.

---

[2] https://taskandpurpose.com/news/iran-supports-taliban/

62. Such extensive support was provided with Iran's explicit knowledge and clear intent that the Taliban would use these resources to carry out terrorist attacks against U.S. personnel and interests in Afghanistan.

63. Iran's deliberate provision of weapons, funding and training substantially increased the Taliban's ability to launch deadly and devastating attacks, including the rocket attack that took Krissie Davis' life.

## TALIBAN ATTACKS ON BAGRAM AIRFIELD

64. Bagram Airfield (also known as Bagram Air Base) ("Bagram") in Parwan Province, Afghanistan, served as one of the largest and most strategically important U.S. military installations in Afghanistan and was a frequent and high-priority target of Taliban terrorism and insurgent attacks.

65. The Taliban and its affiliated terror syndicate (including the Haqqani Network and other insurgent groups) routinely and indiscriminately launched indirect fire attacks against Bagram, employing rockets and mortars to inflict casualties, spread fear, and disrupt operations among U.S. and coalition forces and civilian personnel.

66. These rocket attacks were often indiscriminate and deliberately aimed at the base in general rather than specific military targets, thereby endangering all personnel on base, including soldiers, civilian contractors like Krissie Davis, and other support staff.

67. Parwan Province, where Bagram is located, was recognized as a stronghold of Taliban activity during the period relevant to this case; multiple sources (including U.S. military intelligence and academic studies) noted that from at least 2008 to 2016, the Taliban

maintained significant operational dominance in that region, allowing them to plan and execute attacks with relative impunity.

68.    The Taliban publicly claimed responsibility for at least two major attacks on Bagram Airfield during that time frame, underscoring that such attacks were a well-known and frequently employed tactic of the group in their campaign of terror.

69.    In June 2013, approximately two years before the attack on Krissie Davis, the Taliban conducted a coordinated rocket/mortar attack against Bagram Airfield that resulted in the deaths of four U.S. service members and caused significant damage to the base.

70.    Subsequent thorough investigations by U.S. authorities and explicit findings by U.S. federal courts have definitively linked that June 18, 2013, Bagram attack to material support provided by Iran, establishing a clear connection between Iran's actions and the Taliban's terrorist activities.

71.    Iran's aid to the Taliban was found to be a proximate cause of that deadly 2013 attack.

72.    This established and recurring pattern – a Taliban rocket attack on Bagram causing American fatalities, facilitated by Iranian support – closely and disturbingly parallels the circumstances of the attack on Krissie Davis in 2015, suggesting a consistent and ongoing pattern of Iranian-backed terrorism.

73.    By 2015, Iran's provision of rockets, advanced weaponry, and other armaments to the Taliban had continued unabated and even escalated, directly and substantially enabling the Taliban's ongoing campaign of terror against Americans and U.S. interests in Afghanistan.

### THE JUNE 8, 2015, ROCKET ATTACK AND KRISSIE DAVIS' DEATH

74.   In early June 2015, Krissie Davis served at Bagram Airfield as part of her deployment with the Defense Logistics Agency.

75.   On the morning of June 8, 2015, Krissie Davis was traveling on the base in a vehicle, en route to the Yelner Dining Facility at Bagram, when the Taliban carried out a rocket attack on Bagram.

76.   At approximately 7:00 AM local time, a 107mm rocket, consistent with the type of weaponry supplied by Iran and fired by Taliban militants, struck Bagram.

77.   The rocket exploded upon direct impact with the underside of the specific vehicle in which Krissie Davis was riding, causing catastrophic damage.

78.   Krissie Davis was gravely and irreparably injured by the force of the explosion, succumbed to blast trauma, and died at the scene.

79.   No other personnel were reported injured in this attack, underscoring both the lethal precision with which the rocket struck Krissie Davis' vehicle and the tragic and unique misfortune that she alone was the direct victim of this calculated act.

80.   Krissie Davis, 54 years old at the time, paid the ultimate price while serving her country in a war zone as a dedicated civilian contractor, contributing to critical logistical operations.

81.   The rocket attack on June 8, 2015, that resulted in the death of Krissie Davis was an integral part of the Taliban's broader terror campaign and was executed using the specific type of weaponry that Iran had been consistently supplying to the Taliban.

82.  A 107mm rocket is a military-grade explosive projectile, specifically designed for inflicting maximum damage, and commonly used by insurgent forces in Afghanistan for indirect fire attacks.

83.  Iran's extensive support to the Taliban included, critically, the provision of 107mm rockets, among other arms and forms of material assistance.

84.  Iran knowingly and deliberately provided the Taliban with the very same category of lethal weapon that was ultimately and directly used to kill Krissie Davis.

85.  The deadly attack occurred a mere three days before the *Wall Street Journal* publicly reported on Iran's increased and ongoing support to the Taliban, highlighting the temporal proximity of Iran's actions and the resulting violence.

86.  Iran's escalated and sustained aid, encompassing both weapons and funding, was directly contemporaneous with, and materially contributed to, the Taliban's enhanced ability to execute deadly attacks such as the devastating one at Bagram on June 8, 2015.

## CAUSATION – IRAN'S MATERIAL SUPPORT AS A SUBSTANTIAL FACTOR

87.  The death of Krissie Davis was proximately caused by the concerted actions of the Taliban (who executed the attack) and Iran (which enabled and materially supported the attack).

88.  Iran's support was a substantial factor in the attack.

89.  Proximate cause requires only "some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered." *Havlish v. Bin Laden* (In re Terrorist Attacks on September 11, 2001), 2011 U.S. Dist. LEXIS 155899, at 202 (S.D.N.Y. 2011).

90.     But for Iran's extensive and ongoing provision of critical resources – including the likely and knowing supply of the specific 107mm rocket used in the attack – the Taliban's capability to launch attacks at Bagram with such lethal effect and devastating precision would have been substantially and demonstrably diminished.

91.     Iran's material and substantial support to the Taliban was knowingly given with the clear knowledge and malicious intent that it would be directly used to target U.S. nationals like Krissie Davis, who were serving in Afghanistan.

92.     Under 28 U.S.C. § 1605A(a)(1) and (a)(2)(A)(ii), foreign state sponsors of terrorism, such as Iran, are explicitly not immune from suit in U.S. courts and may be held directly liable for providing material support or resources for acts of extrajudicial killing that cause injury or death to U.S. citizens, including government contractors like Krissie Davis. *Owens v. Republic of Sudan*, No. 14-5105 (D.C. Cir. 2017).

93.     Iran's actions definitively meet each and every element of the FSIA terrorism exception: (a) Iran was a designated state sponsor of terrorism at the time of the attack and remains so to this day; (b) Krissie Davis was a U.S. national and also a U.S. government contractor at the time of her death, both categories of persons expressly covered by the statute (*Owens v. Republic of Sudan*, No. 14-5105 (D.C. Cir. 2017)); (c) Krissie Davis' death was directly and proximately caused by an extrajudicial killing, as that term is precisely defined by law (an intentional, unlawful killing of a civilian, not authorized by any court) and as explicitly used in §1605A; and (d) Iran knowingly provided material support or resources for the Taliban's commission of that extrajudicial killing (*Owens v. Republic of Sudan*, No. 14-5105 (D.C. Cir. 2017)).

94. Accordingly, and without any doubt, Iran is fully liable under federal law for the wrongful death of Krissie Davis.

95. The Taliban, as the entity that directly and intentionally carried out the June 8, 2015, rocket attack, is similarly and independently liable under the Anti-Terrorism Act for causing the death of a U.S. national through a clear act of international terrorism.

96. The calculated attack on Bagram Airfield definitively meets the established definition of an "act of international terrorism" under 18 U.S.C. § 2331: It was a violent act or acts dangerous to human life, that occurred primarily outside the United States, and which was specifically intended to intimidate or coerce a civilian population and to directly influence the policy of a government (the United States and its coalition partners) through assassination or kidnapping (in this case, the assassination of an American national) and through violent coercion.

97. By direct reason of that heinous act of international terrorism, the Estate of Krissie Davis (a U.S. national's estate) has been severely injured and thus has a clear and actionable cause of action against the Taliban under 18 U.S.C. § 2333(a).

98. The Taliban's reprehensible conduct also independently constitutes common-law wrongful death and various terrorism-related intentional torts, for which it possesses no immunity, legal justification, or valid defense.

99. The Taliban, acting in close concert with and substantially aided by the Islamic Republic of Iran, deliberately perpetrated an extrajudicial killing on June 8, 2015, resulting directly in the tragic death of Krissie Davis.

100. The calculated killing of Krissie Davis was a willful, deliberate, and heinous act of terrorism, demonstrating a clear disregard for human life.

101.    Krissie Davis was an entirely innocent civilian, a devoted wife and loving mother who courageously volunteered to serve in a dangerous environment, contributing to the security and well-being of her nation.

102.    The devastating impact of her wholly unnecessary death on her surviving family has been utterly catastrophic – unimaginable and resulting in profound enduring grief, persistent mental anguish, a permanent void in their companionship, and a disruption of the family's emotional and social fabric, causing profound and enduring grief, severe mental anguish, and irreparable mental anguish.

103.    Defendants' actions were demonstrably intentional, utterly malicious, and exhibited a wanton and reckless disregard for human life and established legal norms, thereby entitling Plaintiffs not only to substantial compensatory damages for the personal injury and extensive losses sustained, but also to significant punitive damages designed to punish and effectively deter such egregious and inhumane conduct in the future.

104.    To prevail in an FSIA case, Plaintiffs must definitively demonstrate a clear and proximate cause between the state sponsorship of terror and the specific act that directly caused the injury and subsequent death. Courts have consistently determined that in terrorism cases, proximate cause requires only "some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered." *Havlish v. Bin Laden* (In re Terrorist Attacks on September 11, 2001), 2011 U.S. Dist. LEXIS 155899, at 202 (S.D.N.Y. 2011).

## COUNT I:  WRONGFUL DEATH AND
## PERSONAL INJURY (EXTRAJUDICIAL KILLING)

105.    Plaintiffs hereby incorporate and re-allege each and every allegation set forth in the foregoing paragraphs with the same force and effect as if fully and individually stated herein under 28 U.S.C. § 1605A(c) and 18 U.S.C. § 2333.

106.    The calculated rocket attack on June 8, 2015, which tragically killed Krissie Davis, constituted a clear act of extrajudicial killing – a deliberate and unlawful killing not authorized by any lawful court proceeding or recognized legal authority – within the precise meaning of the FSIA's terrorism exception and the TVPA.  This heinous attack was intentionally carried out by Taliban fighters as an integral part of an orchestrated and ongoing campaign of terrorism specifically targeting U.S. personnel.  28 U.S.C. § 1350 (3)(a).

107.    Defendant Taliban, by deliberately planning, coordinating, and executing the deadly rocket strike against Bagram Airfield that directly caused the death of Krissie Davis, is unequivocally and directly responsible for the extrajudicial killing of a United States national.

108.    The Taliban's reprehensible actions were demonstrably intentional, inherently wrongful, and patently unlawful, violating fundamental principles of human rights and international law.

109.    This conduct violated numerous international and U.S. laws, including prohibitions on attacks against civilians and civilian objects.

110.    The Taliban's calculated act definitively qualifies as a clear act of international terrorism as specifically defined in 18 U.S.C. § 2331, in that it was a violent act or acts dangerous to human life, that occurred primarily outside the United States, and which was

specifically intended to intimidate or coerce a civilian population and to directly influence the policy of a government (the United States and its coalition partners) through assassination or kidnapping (in this case, the assassination of an American national) and through violent coercion.

111.    The act meets the definition of "international terrorism" under 18 U.S. Code § 2331, which defines it as activities that—(A) involve violent acts or acts dangerous to human life that violate the criminal laws of the United States or any state, or that would constitute a criminal violation if committed within the jurisdiction of the United States or any state; (B) appear to be intended—(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and (C) occur primarily outside the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek sanctuary.    The determination of whether an act constitutes international terrorism is further supported by the ruling in *Boim v. Holy Land Foundation for Relief and Development,* 549 F.3d 685 (7th Cir. 2008).

112.    By reason of this act of international terrorism, Plaintiff, individually and as the representative of the Estate of Krissie Davis (a U.S. national), has suffered damages, and the Taliban is therefore liable under 18 U.S.C. § 2333(a) for all damages proximately resulting from this attack, including compensatory and punitive damages, as well as attorneys' fees and costs, as provided for under 18 U.S.C. § 2333 (Civil remedies).

113.    Defendant Islamic Republic of Iran, through its officials, agents, and instrumentalities, provided material support and resources to the Taliban that substantially assisted and facilitated the extrajudicial killing of Krissie Davis.

114.    Iran's support, which included providing the specific type of 107mm rockets used in the attack on Bagram, was furnished with actual knowledge or willful disregard of the fact that such support would be used for terrorist attacks against U.S. forces and personnel, including civilian contractors like Krissie Davis.

115.    Iran's material support was a proximate cause of the attack and Krissie Davis's death, as it enabled the Taliban to carry out the rocket strike effectively. Under 28 U.S.C. § 1605A(a)(1) and (c), Iran is liable for the personal injury and death of Krissie Davis because her death was caused by an extrajudicial killing for which Iran provided material support (*Owens v. Republic of Sudan,* No. 14-5105 (D.C. Cir. 2017).

116.    Iran's conduct satisfies all elements required under §1605A for liability: (a) Krissie Davis was a U.S. national and a U.S. government contractor at the time of the attack (*Owens v. Republic of Sudan*, No. 14-5105 (D.C. Cir. 2017)); (b) Iran was a designated state sponsor of terrorism at that time and remains so; and (c) Iran's provision of funds, training, and weaponry to the Taliban was a substantial factor in enabling the Taliban's ability to carry out the fatal attack, thereby proximately causing Krissie Davis's death (*Owens v. Republic of Sudan*, No. 14-5105 (D.C. Cir. 2017)).

117.    Defendants' actions described above (the planning, support, and execution of a deadly terrorist attack) constituted wrongful acts and omissions that directly caused the death of Krissie Davis and caused her to suffer severe injuries and violence prior to her death.

118.    Krissie Davis endured the terror and physical impact of the rocket explosion, and although she perished quickly, she sustained conscious pain and suffering in the moments of the attack, and she was deprived of her life and future, experiencing the full horror of the attack in her final moments.

119.    Although her death was relatively quick after the injury Defendants caused, she sustained conscious pain and suffering in the moments of the attack. Furthermore, she was permanently deprived of her life and future, including the opportunity to see her family again, celebrate milestones, and experience the joys of life she had diligently worked so hard to achieve, resulting in an immense and irreparable loss.

120.    As the personal representative of Krissie Davis's Estate, Plaintiff seeks all available damages for her wrongful death and any survival claims, including damages for pain and suffering, lost earnings and economic benefits, loss of enjoyment of life, and other personal injury damages sustained by Krissie Davis prior to and as a direct result of her death.

121.    By reason of the Defendants' willful and unlawful acts, Plaintiffs have suffered substantial losses recoverable under 28 U.S.C. § 1605A(c) (which provides for recovery of economic damages, solatium, pain and suffering, and punitive damages) and under 18 U.S.C. § 2333(a) (which provides for treble damages and attorneys' fees for injuries by reason of an act of international terrorism).

122.    The Estate of Krissie Davis, acting on behalf of the survivors and heirs of Krissie Davis, which includes Angela Mitchell, has sustained and will continue to sustain significant economic losses (including loss of income, employment benefits, and support that Krissie

Davis would have provided) and profound non-economic losses as a direct result of her wrongful death.

**WHEREFORE**, Plaintiffs demand that judgment be entered against Defendants, Islamic Republic of Iran and the Taliban, jointly and severally, on behalf of Plaintiffs, for substantial compensatory damages in an amount to be determined by the Special Master for the USVSST Fund, for the personal injury and wrongful death of Krissie Davis. This includes, but is not limited to, damages for her pain and suffering, lost earnings, loss of enjoyment of life, medical and funeral expenses, and other applicable survival and wrongful death damages, punitive damages, together with such other relief as the Court deems appropriate.

## COUNT II:
## LOSS OF SOLATIUM

123.    Plaintiffs incorporate and re-allege every allegation set forth above as if fully stated herein on behalf of Plaintiff for the benefit of Krissie Davis's surviving immediate family, under 28 U.S.C. § 1605A(c) and common law.

124.    As a direct and proximate result of the willful, wrongful, and terroristic acts of Defendants, the surviving family members of Krissie Davis have suffered extreme mental anguish, emotional pain and suffering, and the loss of Krissie Davis's society, companionship, comfort, advice, and support.   Krissie Davis was a beloved wife, daughter, and mother.

125.    Her violent death has caused and continues to cause her loved one's severe mental anguish and grief.

126.    They must live with the permanent, irreplaceable absence of Krissie Davis's love and presence in their lives.

127. The emotional trauma inflicted upon Krissie Davis's family was not an unintended byproduct of Defendants' actions – rather, the intentional infliction of such pain is a known and intended consequence of acts of terrorism.

128. The very purpose of terrorist attacks like the one that killed Krissie Davis is not only to harm the immediate victims, but also to terrorize and emotionally scar their families and communities.

129. Defendants thus intentionally caused emotional injury to Krissie Davis's next-of-kin by means of extreme and outrageous violent acts, with the specific aim of causing widespread terror and anguish.

130. Accordingly, Plaintiff (as the Estate acting on behalf of the immediate family of Krissie Davis) brings this claim for solatium, which under the FSIA terrorism cause of action refers to the damages for the mental anguish and emotional harm suffered by the victim's close relatives.

131. This claim is brought pursuant to 28 U.S.C. § 1605A(c), which expressly permits recovery of solatium damages by the relatives of a deceased victim of state-sponsored terrorism, or, in the alternative, under applicable state common law providing for wrongful death damages to surviving family (such as the law of Alabama, Krissie Davis's domicile, or the law of the District of Columbia) that allow recovery for loss of society and companionship.

132. **WHEREFORE**, Plaintiffs, on behalf of Krissie Davis's surviving family members, demand that judgment be entered against Defendants in an amount to be proven at trial for solatium damages, including compensation for the survivors' loss of Krissie Davis's society, companionship, love, affection, guidance, and support, and for their severe

mental anguish and emotional distress, as well as punitive damages, together with any additional relief as the Court finds just and proper.

<div align="center">

**COUNT III:**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

</div>

133.  Plaintiffs incorporate and re-allege each and every allegation set forth above with like effect as if alleged herein, on behalf of all Plaintiffs – Extreme and Outrageous Conduct Causing Severe Emotional Distress, pursuant to 28 U.S.C. § 1605A(c) or, alternatively, common law.

134.  On June 8, 2015, members of the Taliban, acting with willful and malicious intent, fired a rocket into Bagram Airfield, resulting in the violent and unwarned killing of Krissie Davis, a deliberate act of terror.  Launching a rocket attack on a base, especially targeting a dining facility area frequented by unarmed civilians, constitutes extreme and outrageous conduct that transcends all standards of decency and civility.

135.  The Taliban's actions were not merely negligent but were intentional and calculated, demonstrating an utter disregard, bordering on contempt, for the life of Krissie Davis and the profound trauma that her death would inevitably inflict on her family.

136.  These acts were enabled and directly facilitated by Iran's knowing funding and supply of weaponry to the Taliban, thereby directly implicating Iran in this outrageous conduct. Iran was acutely aware that the resources it provided would be instrumental in committing such acts of terrorism, yet Iran persisted in this conduct, thereby demonstrating a reckless and callous indifference to the lives, safety, and emotional well-being of American families.

137. Defendants' conduct was so outrageous in character and so extreme in degree as to transcend the bounds of what any reasonable person in a civilized society could be expected to endure; it is conduct that is truly atrocious and utterly intolerable.

138. The act of killing a 54-year-old mother and wife with a rocket is an atrocity that deeply shocks the conscience and violates fundamental norms of humanity. Iran's direct role in materially and substantially supporting the Taliban's terror campaign, coupled with the Taliban's deliberate and malicious targeting of Americans, unequivocally renders both Defendants fully culpable and liable for this extreme and outrageous act.

139. As a direct and foreseeable result of Defendants' willful and intentional acts of terrorism, the family members of Krissie Davis, for whose benefit this claim is brought, have suffered and continue to suffer severe emotional distress, including but not limited to profound grief, anguish, and psychological trauma.

140. The family members of Krissie Davis have endured and continue to endure profound anguish, inconsolable grief, persistent nightmares, and lasting psychological trauma, fully aware of the cruel and senseless manner in which Krissie Davis was murdered and forced to live with the permanent and devastating reality of her absence.

141. The emotional harm inflicted upon Krissie Davis's family was significantly exacerbated by the knowledge that Krissie Davis's life was not merely lost but was deliberately taken as part of a heinous act of terrorism – a fact that adds immeasurable horror, notoriety, and lasting psychological damage because of the loss.

142. As a direct consequence of her murder, Krissie Davis's loved ones have experienced persistent depression, overwhelming sorrow, a pervasive sense of emptiness, and a

significant loss of enjoyment of life, impacting their ability to function normally and maintain their well-being.

143.  Plaintiffs plead intentional infliction of emotional distress ("IIED") under the substantive law of the District of Columbia, the forum, which explicitly permits recovery by immediate family members for emotional distress caused by outrageous acts of terrorism, such as the intentional murder of a family member, thereby providing an additional basis for the claim. (*Owens v. Republic of Sudan*, No. 14-5105 (D.C. Cir. 2017)).

144.  The emotional distress of the survivors, family members and heirs of Krissie Davis is not only severe and debilitating, but also far beyond the ordinary grief that accompanies any death; it represents a profound, enduring, and life-altering psychological injury, precisely the type of severe emotional harm that the law explicitly recognizes and compensates in claims of IIED.

145.  Each immediate family member of Krissie Davis, including her spouse, children, parents, and other close relatives, possesses the legal standing to assert a cause of action for intentional infliction of emotional distress against Defendants, given the direct connection between Defendants' wrongful, intentional, and malicious acts and the resulting emotional harm suffered by the family.

146.  In terrorism cases, the immediate relatives of the decedent are rightfully considered direct victims of the extreme and outrageous conduct, even if they were not physically present at the attack, because terrorists specifically intend to cause severe and lasting emotional harm to those who loved and cared for the victim, recognizing that such harm is an integral part of their terroristic objectives.

147.  Under 28 U.S.C. § 1605A(c), a foreign state sponsor of terrorism, such as Iran, is unequivocally liable for IIED, a personal injury, suffered by the victim's family as a direct result of its material support for terrorism.

148.  Likewise, the Taliban, as the direct perpetrator of the attack, is liable under applicable law for IIED toward the family, including direct liability under the Anti-Terrorism Act, 18 U.S.C. § 2333, for perpetrating an act of international terrorism that caused severe emotional distress.

149.  **WHEREFORE**, Plaintiffs respectfully demand that judgment be entered against Defendants for compensatory damages in an amount sufficient to fully and justly compensate the severe emotional distress, profound mental anguish, and lasting psychological trauma suffered by Krissie Davis' family as a direct result of Defendants' outrageous and heinous conduct, with the specific amount to be determined at trial, along with punitive damages and such further relief as the Court deems appropriate and equitable.

<div align="center">

**COUNT IV:**
**PUNITIVE DAMAGES**

</div>

150.  Plaintiffs hereby incorporate and re-allege each and every allegation set forth above with the same force and effect as if fully stated herein, against all Defendants, under the provisions of 28 U.S.C. § 1605A(c) and 18 U.S.C. § 2333.

151.  The actions of the Defendants were not only intentional and malicious but also demonstrated a reckless and wanton disregard for human life, the rule of law, and fundamental principles of justice.

152.    Iran and the Taliban engaged in a deliberate and sustained campaign of terrorism, callously targeting innocents and seeking to advance their extremist aims through murder, mayhem, and widespread terror.

153.    Such reprehensible actions not only violate domestic and international legal standards but also fundamentally undermine the principles of human dignity, security, and civilized conduct.

154.    Such conduct was not only criminal, outrageous, and extreme, but also constitutes a grave affront to justice and humanity.

155.    Defendants' continuing acts of sponsorship and perpetration of terror – starkly exemplified by the brutal attack that killed Krissie Davis – must be unequivocally held up as a clear example to the world that this Court will not, under any circumstances, tolerate acts of terrorism nor those who enable, fund, and support terrorism.

156.    An award of punitive damages is not only fully authorized by law in this case but is also necessary to effectively punish these Defendants for their heinous actions and to serve as a powerful deterrent to prevent them and others from ever again orchestrating, supporting, or enabling acts of terror against Americans or any other innocent civilians.

157.    The FSIA's private right of action expressly permits the recovery of punitive damages against state sponsors of terrorism like Iran.

158.    The ATA permits the imposition of punitive/exemplary damages in the form of treble damages against those who commit acts of international terrorism (and indeed mandates treble damages under 18 U.S.C. § 2333(a)).

159.    This mandatory aspect of treble damages underscores Congress's intent to severely penalize acts of terrorism and provide maximum compensation to victims.

160.   Punitive damages are particularly and overwhelmingly warranted against Iran for its egregious and sustained conduct in materially aiding the Taliban's terrorist activities over many years, demonstrating a callous and persistent disregard for the lives and safety of U.S. citizens.

161.   This profound disregard is further and irrefutably evidenced by Iran's continued and unwavering support despite its full knowledge of the Taliban's violent targeting of Americans.

162.   Punitive damages are also fully warranted against the Taliban to punish its wanton and malicious disregard for human life, to denounce its terroristic acts, and to serve as a powerful and unequivocal deterrent example to this and all other terrorist organizations worldwide.

163.   Each of the Defendants acted with actual malice, deliberate intent, and extreme recklessness in a manner that not only justifies but compels an award of substantial punitive or exemplary damages.

164.   Iran's sustained and knowing sponsorship of a terror campaign that included the calculated murdering of American citizens, and the Taliban's cold-blooded and premeditated killing of Krissie Davis, demonstrate a complete and utter devaluation of human life, international norms, and fundamental principles of justice.

165.   An appropriate and substantial punitive damages award will serve to effectively punish these Defendants for their heinous and reprehensible behavior and send a clear, unequivocal, and resounding message to the world that support for and acts of terrorism against Americans will carry the most severe and far-reaching civil penalties.

166.    **WHEREFORE**, Plaintiffs fervently pray for an award of punitive damages against Defendants, jointly and severally, in an amount sufficient not only to punish them severely for their willful and malicious conduct but also to deter them and others from engaging in similar conduct in the future. Such amount should be determined according to proof presented at trial and in strict accordance with 28 U.S.C. § 1605A(c), which explicitly authorizes punitive damages against state sponsors of terrorism, and the mandatory treble-damages provision of 18 U.S.C. § 2333(a), with the ultimate objective of making Defendants a stark example that the sponsorship and commission of terrorist acts against U.S. citizens will inevitably result in severe and devastating financial consequences.

## PRAYER FOR RELIEF

167.    **WHEREFORE**, in light of the foregoing, Plaintiffs respectfully request that this Honorable Court enter judgment in Plaintiffs' favor and against Defendants, Islamic Republic of Iran and the Taliban, jointly and severally, as follows:

168.    Enter judgment against Iran finding it liable under 28 U.S.C. § 1605A(c).

169.    **Compensatory Damages**: Awarding Plaintiffs compensatory damages to cover all legally recoverable losses, including, but not limited to, damages for the physical pain, emotional suffering, and mental anguish experienced by Krissie Davis prior to her death; the loss of past and future economic support and services resulting from her death; and the mental anguish, emotional distress, and loss of solatium suffered by her surviving family members, with the specific amounts to be determined at trial based on evidence presented.

170. **Solatium Damages:** Awarding damages for loss of solatium and consortium to the surviving immediate family of Krissie Davis, to justly compensate them for the profound loss of her society, companionship, love, affection, guidance, and support, with the specific monetary amounts to be determined at trial based on evidence of their emotional distress and loss.

171. **Punitive/Exemplary Damages:** Awarding Plaintiffs punitive damages against Defendants in an amount sufficient to punish Defendants for their egregious, willful, and malicious conduct, to deter them and others from engaging in such conduct in the future, and to reflect the severity of their actions, as permitted by 28 U.S.C. § 1605A(c) and applicable law.

172. Plaintiffs respectfully suggest that the punitive damages be set at a level reflecting Defendants' egregious wrongdoing, the need to send an unequivocal message that state-sponsored terrorism and acts of terror will not be countenanced by civilized society, and the necessity of deterring similar actions by other potential perpetrators.

173. **Pre- and Post-Judgment Interest:** Awarding Plaintiffs pre-judgment interest from June 8, 2015, until the date of judgment, and post-judgment interest thereafter, at the maximum rate allowable by law, to fully compensate Plaintiffs for the time value of damages incurred and to ensure that Plaintiffs are made whole for the delay in receiving compensation.

174. **Attorneys' Fees and Costs:** Awarding Plaintiffs the costs of this action, including reasonable attorneys' fees and all related expenses, as authorized by, inter alia, 18 U.S.C.

§ 2333(a), encompassing an award of the cost of suit, expert witness fees, investigation expenses, and attorneys' fees, as well as any other applicable provision or authority.

175. **Any Further Relief:** Granting such other and further relief as the Court deems just and proper under the circumstances, including, but not limited to, equitable relief, declaratory relief, and leave to amend this Complaint if the interests of justice so require, to ensure full and complete redress for the Plaintiffs' injuries and losses.

**Dated:** June 10, 2025.

Respectfully submitted,

/s/ Jon D. Pels
_____
Jon D. Pels, Esq.
Maria L. Olsen, Esq.
The Pels Law Firm
4845 Rugby Ave., 3rd floor
Bethesda, MD 20814
jpels@pelslaw.com
molsen@pelslaw.com


_____
Chrystan Carlton, Esq.
(IL Bar No. 6305191)
Carlton Law, Ltd.
161 N Clark St, Suite 1600
Chicago, IL 60601, USA
Tel: (312) 265 -7320
chrystan@carltonlawltd.com
Admission application pending

*Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

در دادگاه منطقه‌ای ایالات متحده برای ناحیهٔ کلمبیا

**Plaintiffs:**

انجلا میچل، به‌صورت فردی و به‌عنوان نمایندهٔ دارایی‌های کریسی دیویس،
خواهان‌ها

**v.**

در مقابل

**Defendants:**

جمهوری اسلامی ایران و طالبان،
خواندگان

Civil Action Case No. _____

شماره پرونده دعوای مدنی: _____

## COMPLAINT

شکایت‌نامه

## Introduction (Action Brought):

این دعوا توسط خواهان، انجلا میچل، از طریق وکلای خود، برای منافع شخصی خویش و به‌عنوان نمایندهٔ دارایی‌های کریسی دیویس ـ مطابق حق قانونی وی در جهت طرح دعوی تحت «قانون مصونیت دولت‌های خارجی» (بند 28 قانون ایالات متحده، ((§1605(c)A)) ـ اقامه می‌شود. خواهان، به‌وسیلهٔ وکلا، با احترام این دعوی را علیه خواندگان، جمهوری اسلامی ایران («ایران») و طالبان («طالبان»)، به‌صورت مشترک و جداگانه، بابت صدمات جسمی و مرگ غیرقانونی ناشی از اقدامات تروریستی، تحت ادعای قتل فراقضایی و ارائهٔ حمایت مادی از تروریسم توسط خواندگان، طرح می‌کند. در حمایت از این شکایت‌نامه، خواهان به‌شرح زیر ادعا می‌نماید:

## JURISDICTION, VENUE, AND CHOICE OF LAW

صلاحیت دادگاه، محل رسیدگی، و قانون حاکم

## 1. Subject-Matter Jurisdiction:

این دادگاه بر اساس بندهای a)1330 28 U.S.C. §§)، 1331، و A1605 و همچنین اصول صلاحیت تکمیلی به دلیل ارتباط ادعاها علیه هر دو خوانده , دارای صلاحیت موضوعی برای رسیدگی به این دعوی است.

## 2. Defendant Islamic Republic of Iran:

خوانده، «جمهوری اسلامی ایران» («ایران»)، یک دولت خارجی است که از سال ۱۹۸۴ پیوسته از سوی ایالات متحده به عنوان «حامی دولتی تروریسم» شناخته شده است.

## 3. FSIA Terrorism Exception:

طبق استثنای تروریسم در «قانون مصونیت دولت‌های خارجی» (FSIA)، بند ۲۸ قانون ایالات متحده A1605 §، ایران در دادگاه‌های آمریکا بابت صدمات جسمی یا مرگ ناشی از «قتل فراقضایی» و نیز تأمین حمایت یا منابع مادی برای چنین اقدامی، قابل تعقیب است. (Owens v. Republic of Sudan، پرونده شماره 14-5105، دیوان استیناف ناحیه دی.سی.، ۲۰۱۷)

## 4. Defendant the Taliban:

خوانده، «طالبان»، یک سازمان تروریستی خارجی غیرمؤسسه‌ای است؛ در نتیجه دولت به شمار نمی‌آید و از مصونیت حاکمیتی برخوردار نیست. صلاحیت رسیدگی به دعاوی علیه طالبان بر مبنای صلاحیت موضوعی فدرال (۱۸ U.S.C. § 2333، جبران مدنی برای اعمال تروریسم بین‌المللی) و صلاحیت تنوع (۲۸ U.S.C. § 1332(a)(2)) است، زیرا اعضای طالبان تبعه یا تابع دولت خارجی افغانستان‌اند.

## 5. Private Cause of Action (28 U.S.C. § 1605A(c))

بند ۲۸ U.S.C. § 1605A(c) یک سبب دعوای فدرال خصوصی برای اتباع ایالات متحده (و نمایندگان قانونی ایشان) علیه دولت‌های حامی تروریسم مقرر می‌کند تا برای صدمات جسمی یا مرگ ناشی از جمله «قتل فراقضایی» و تأمین حمایت مادی آن اقامه دعوی نمایند. (Owens v. Republic of Sudan، 14-5105، دیوان استیناف ناحیه دی.سی.، ۲۰۱۷)

## 6. Anti-Terrorism Act Claims:

دعاوی حاضر افزون بر سبب دعوای فوق، تحت «قانون ضد تروریسم» (ATA)، ۱۸ U.S.C. § 2333(a) نیز طرح شده‌اند؛ این قانون به اتباع آمریکا، دارایی‌ها، بازماندگان یا وراث آن‌ها اجازه می‌دهد بابت صدمات وارده «به دلیل عمل تروریسم بین‌المللی» در دادگاه‌های ایالات متحده شکایت کنند.

## 7. TVPA Definition of Extrajudicial Killing:

«قانون حمایت از قربانیان شکنجه» (۲۸ U.S.C) «TVPA. § 1350، «قتل فراقضایی» را به عنوان یک قتل عمدی و قابل طرح دعوی تعریف می‌کند که بدون حکم معتبر دادگاه انجام شده باشد.

### 8. Krissie Davis' death:
مرگ کریسی دیویس، همان‌گونه که در ادامه توضیح داده شده است، در چارچوب این قوانین به‌عنوان «قتل فراقضایی» احصا می‌شود.

### 9. Iran's and the Taliban's conduct:
اقدامات ایران و طالبان کاملاً در استثنای تروریسم قانون مصونیت دولت‌های خارجی (FSIA) قرار می‌گیرد. (پرونده Owens v. Republic of Sudan، شماره 14-5105، دادگاه استیناف دی‌سی.، ۲۰۱۷)

### 10. Venue (28 U.S.C. § 1391(f)(4)):
صلاحیت محلی این دادگاه بر اساس بند ۲۸ U.S.C. § 1391(f)(4) صحیح است؛ این بند اجازه می‌دهد دعوای مدنی علیه یک دولت خارجی در دادگاه ناحیه‌ای ایالات متحده برای ناحیهٔ کلمبیا مطرح شود.

### 11. ATA Venue (18 U.S.C. § 2334(a)):
مقرره صلاحیت محلی قانون ضد تروریسم (ATA)، بند ۱۸ U.S.C. § 2334(a)، اجازه می‌دهد دعاوی تحت § 2333 «در هر دادگاه ناحیه‌ای مناسب ایالات متحده» اقامه گردد.

### 12. Defendants' status:
خوانده ایران یک دولت خارجی با حاکمیت مستقل است و خوانده طالبان در هیچ یک از حوزه های قضائی ایالات متحده، اقامتگاه یا نماینده ثبت‌شده‌ای ندارد.

### 13. Appropriate forum:
با توجه به این عوامل و اهمیت ملی مبارزه با تروریسم، ناحیهٔ کلمبیا محل رسیدگی مناسبی برای این دعوا محسوب می‌شود.

### 14. Federal basis of claims:
ادعاهای خواهان بر پایه حقوق فدرال، به‌ویژه قوانین مبارزه با تروریسم (۲۸ U.S.C. § 1605A و ۱۸ U.S.C. § 2333)، مطرح شده است.

### 15. Nature of causes of action:
این ادعاها سبب‌های دعوای فدرال منحصربه‌فردی برای مرگ غیرقانونی، صدمات جسمی و سایر جرائم مدنی مرتبط با اقدامات دولت‌های حامی تروریسم و عوامل آنان ایجاد می‌کند.

### 16. Potential state law reference:
در صورتی که بخشی از ادعاها نیازمند ارجاع به حقوق ایالتی باشد، قانون محل طرح دعوی (ناحیهٔ کلمبیا) یا قانون اقامتگاه متوفی (ایالت آلاباما) اعمال خواهد شد.

### 17. Federal control (28 U.S.C. § 1605A(c)):
با این حال، چون بند ۲۸ U.S.C. § 1605A(c) حق دعوای خصوصی فدرال را پیش‌بینی کرده است، حقوق فدرال حاکم خواهد بود و مسئولیت خواندگان بر اساس قوانین فدرال بدون نیاز به توسل به حقوق مسئولیت مدنی ایالتی، احراز می‌گردد. (Owens v. Republic of Sudan، شماره 14-5105، دادگاه استیناف دی‌سی.، ۲۰۱۷)

**THE PARTIES — طرفین**

<div dir="rtl">

**PLAINTIFFS — خواهان‌ها**

### 18. FSIA Survivor Claim ( 18):

این دعوا به‌وسیلهٔ خواهان، به واسطهٔ وکلایش، در ظرفیت شخصی وی به‌عنوان یکی از اعضای بازماندهٔ خانواده و وارث قانونی کریسی دیویس، که بر پایهٔ قانون مصونیت دولت‌های خارجی (FSIA) حق طرح دعوی دارد، اقامه می‌شود. کریسی دیویس شهروند ایالات متحده بود.

### 19. Representation by Angella Mitchell ( 19):

انجلا میچل، شهروند ایالات متحده، این دعوا را به نمایندگی از خود و تمام افرادی که قانوناً محق به مطالبهٔ خسارت بابت مرگ غیرقانونی هستند ـ از جمله اعضای بازماندهٔ خانوادهٔ ماش ـ جهت احقاق حق و جبران خسارت‌های آنان مطرح می‌کند. انجلا میچل از اعضای بازماندهٔ خانوادهٔ کریسی دیویس است و به‌عنوان نمایندهٔ شخصی دارایی‌های کریسی دیویس منصوب شده است.

### 20. Terrorist Attack & Death ¶ 20):

کریسی دیویس در ۸ ژوئن ۲۰۱۵ بر اثر حملهٔ راکتی تروریستی در پایگاه هوایی بگرام افغانستان، به طرز فاجعه‌باری کشته شد.

### 21. Residence & Citizenship ( 21):

در زمان وقوع اعمال مورد ادعا و در تمامی اوقات مرتبط کریسی دیویس ساکن تالادیگا، ایالت آلاباما و شهروند ایالات متحده بود.

### 22. DLA Deployment ¶ 22):

در سال ۲۰۱۵، کریسی دیویس به‌عنوان «متخصص امحای اموال» در سازمان تدارکات دفاعی (DLA) به افغانستان اعزام شد.

### 23. DLA Mission ( 23):

سازمان DLA زنجیرهٔ تأمین جهانی دفاع را از آغاز تا پایان مدیریت می‌کند؛ از تأمین مواد اولیه تا تحویل نهایی به مصرف‌کننده، برای پنج نیروی نظامی ایالات متحده، یازده ستاد فرماندهی رزمی، سایر نهادهای فدرال، ایالتی و محلی، شرکای سازمانی و کشورهای متحد ارائه می‌شود.

### 24. FSIA Terrorism Exception ( 24):

به‌عنوان کارمند وزارت دفاع ایالات متحده و پیمانکار غیرنظامی حامی عملیات نظامی، کریسی دیویس در زمرهٔ افرادی قرار می‌گیرد که استثنای تروریسم در FSIA از آنان حمایت می‌کند (کارمندان یا پیمانکاران دولت آمریکا که در خارج از کشور در حیطهٔ وظایف خود فعالیت می‌کنند). (Owens v. Republic of Sudan، پروندهٔ شماره ۵۱۰۵-۱۴، دیوان استیناف ناحیهٔ دی.سی.، ۲۰۱۷)

</div>

## 25. Survivors & Emotional Harm:

وی پس از مرگ، بازماندگانی چون انجلا میچل، دارایی (Estate) واعضای نزدیک خانواده با احتساب بستگان درجه‌یک را بر جای گذاشته است که از فقدان ناگهانگام کریسی دیویس دچار اندوه و رنج روحی عمیق شده‌اند.

## 26. Joint & Several Liability:

بر اساس حقوق فدرال قابل‌اعمال از جمله U.S.C. § 1605A 28 و U.S.C 18 § 2333 خواندگان به طور تضامنی و انفرادی نسبت به تمام خسارات وارده به خواهان‌ها مسئول‌اند.

## 27. Iran State Sponsor of Terrorism:

خوانده «جمهوری اسلامی ایران» یک دولت خارجی است که از ۱۹ ژانویه ۱۹۸۴ به طور مستمر توسط وزارت امور خارجهٔ ایالات متحده به عنوان دولت حامی تروریسم شناخته شده است.

## 28. Continuous Designation (2015–Present):

ایران در سال ۲۰۱۵ نیز در همین فهرست قرار داشت و تا به امروز همچنان چنین است.

## 29. Material Support to Taliban:

ایران در تمام زمان‌های مرتبط با این دعوا، همچنان حمایت مالی، آموزش، تسلیحات و پناه امن را در اختیار طالبان قرار داده و می‌دهد تا کارزار خشونت‌آمیز آن علیه منافع و پرسنل ایالات متحده در افغانستان و منطقه را تقویت کند.

## 30. FSIA Liability for Extrajudicial Killing:

بر پایهٔ استثنای تروریسم در FSIA (28 U.S.C. § 1605A)، ایران به سبب تأمین حمایت و منابع مادی برای اقدامات قتل فراقضایی که موجب مرگ شهروندان آمریکایی شده است، قابل تعقیب می‌باشد. (Owens v. Republic of Sudan، پروندهٔ 14-5105، ۲۰۱۷)

## 31. Service of Process & Due Process:

ابلاغ قضایی به ایران مطابق 28 U.S.C. § 1608(a) انجام می‌شود. «دادرسی منصفانه مستلزم اطلاع رسانی است که با توجه به همه شرایط، به‌طور متعارف طرفین ذینفع را از جریان دعوا آگاه کند و فرصت طرح اعتراضات را فراهم آورد.» (Mullane v. Central Hanover Bank & Trust Co., 339 U.S 306, 314 (1950))

## 32. Vicarious Liability for Agents:

اقدامات توصیف شدهٔ ایران به‌وسیلهٔ مسئولان، کارمندان یا نمایندگان آن و در حدود وظایف یا سمت‌شان صورت گرفته است؛ بنابراین ایران طبق 28 U.S.C. § 1605A(c) مسئول این اعمال و خسارات ناشی از آن‌ها می‌باشد.

**DEFENDANTS — خواندگان**

**THE TALIBAN — طالبان**

**33.**
۳۳. طالبان یک سازمان شبه‌نظامی و موجودیتی تروریستی شناخته‌شده از سوی چندین نهاد بین‌المللی از جمله قطعنامهٔ ۱۲۶۷ شورای امنیت سازمان ملل متحد و دولت‌های ملی مختلف است.

**34.**
۳۴. در دورهٔ زمانی مربوطه، طالبان به‌عنوان یک شورش مسلحانه در افغانستان فعالیت می‌کرد و به اقدامات گستردهٔ تروریستی و خشونت‌آمیز دست می‌زد.

**35.**
۳۵. خواندهٔ طالبان یک سازمان اسلام‌گرای شبه‌نظامی و موجودیت تروریستی شناخته‌شده است که در بازهٔ مربوطه به‌صورت یک شورش مسلحانه در افغانستان فعالیت داشته است.

**36.**
۳۶. طالبان از سوی ایالات متحده یا اکثر کشورهای دیگر به‌عنوان دولت به رسمیت شناخته نشده و بنابراین در دادگاه‌های آمریکا از مصونیت حاکمیتی یا هر نوع مصونیت دیگری برخوردار نیست.

**37.**
۳۷. این عدم شناسایی، جایگاه آنان را به‌عنوان یک بازیگر غیردولتی درگیر در تروریسم برجسته می‌کند.

**38.**
۳۸. طالبان مدت‌هاست که کارزار تروریستی و جنگ چریکی گسترده و مداومی را علیه نیروهای نظامی ایالات متحده، پیمانکاران غیرنظامی و نیروهای ائتلاف در افغانستان به پیش می‌برد و تلفات و بی‌ثباتی قابل‌توجهی ایجاد کرده است.

**39.**
۳۹. این اقدامات تروریستی و جنگ چریکی شامل شلیک مستمر راکت، خمپاره و سلاح‌های آتش غیرمستقیم به پایگاه‌های آمریکا (از جمله پایگاه هوایی بگرام)، حملات هماهنگ پیچیده به اهداف نظامی و غیرنظامی، بمب‌گذاری‌های انتحاری علیه نیروهای نظامی و مردمی، و به‌کارگیری بمب‌های کنار جاده‌ای (IED) در مسیرها بوده است.

**40.**
۴۰. طالبان و گروه‌های وابسته عموماً مسئولیت این حملات به‌ویژه حملاتی که تلفات سنگینی به نیروهای آمریکایی یا متحدانش وارد می‌کند را بر عهده می‌گیرند تا در چارچوب تبلیغات و روابط عمومی، وجهه و نفوذ خود را تقویت نمایند.

**41.**
۴۱. با توجه به اینکه طالبان نشانی رسمی ندارد و به‌صورت فراملی فعالیت می‌کند، ابلاغ اوراق قضایی می‌تواند طبق قاعدهٔ ۴(f)(3) از «آیین دادرسی مدنی فدرال» انجام پذیرد.

**41. (continued)**

۴۱. (ادامه) این قاعده امکان بهکارگیری شیوه‌های جایگزین ابلاغ که بهطور بین‌المللی مورد توافق قرار گرفته‌اند یا هر روش دیگری را که دادگاه برای اطمینان از اطلاع‌رسانی کافی تجویز کند، فراهم می‌نماید.

**42.**

۴۲. رهبران طالبان با اطلاع و موافقت برخی عوامل در کشورهای افغانستان، پاکستان و تا حدی در خاک ایران، دارای دفتر، اردوگاه‌های آموزشی و پناهگاه‌های امن بودند.

**43.**

۴۳. اقدامات طالبان که در این شکواییه تشریح شده است، از جمله قتل فراقضایی کریسی دیویس، در چارچوب مأموریت طالبان برای پیشبرد کارزار تروریستی‌اش انجام شده است.

**44.**

۴۴. طالبان بر پایهٔ حقوق فدرال قابل‌اعمال (U.S.C. § 2333(a) 18)) مستقیماً مسئول خسارات ناشی از این اقدامات است.

**45.**

۴۵. طالبان با همکاری و دریافت حمایت مادی قابل‌توجه، منابع و راهبردهای عملیاتی از ایران، حمله‌ای را که منجر به کشته‌شدن کریسی دیویس گردید اجرا کرد؛ بنابراین هر دو خوانده بهطور تضامنی و انفرادی در قبال خسارات وارده مسئول‌اند.

**46.**

۴۶. حمایت مادی ایران شامل تأمین مالی، تسلیحات و آموزش می‌شود.

**IRAN** — ایران

**47.**

۴۷. خوانده، «جمهوری اسلامی ایران»، دولتی خارجی است که از ۱۹ ژانویهٔ ۱۹۸۴ تاکنون، طبق § 1754(c) «قانون مجوز دفاع ملی» (۲۰۱۹) - و پیش‌تر بر اساس § 60 «قانون اداره صادرات ۱۹۷۹» (U.S.C. App 50 § 2405) و § A620 «قانون کمک‌های خارجی ۱۹۶۱» (22 U.S.C § 2371) بهعنوان دولت حامی تروریسم تعیین شده و همچنان در این فهرست باقی مانده است.

**48.**

۴۸. ایران در تمام زمان‌های مرتبط با این دعوا، حمایت و منابع مادی قابل‌توجهی در اختیار طالبان قرار داده و می‌دهد تا کارزار خشونت‌آمیز این گروه را پشتیبانی کند.

**49. Iran's Direct Causation:**

ایران، از طریق اقدامات مستقیم خود و نیز اقدامات عواملش، با فراهم‌ساختن تأمین مالی کلان، هدایت راهبردی، تسلیحات پیشرفته، پشتیبانی لجستیکی، تشویق، پناه امن و آموزش جامع برای طالبان جهت انجام فعالیت‌های تروریستی، موجب مرگ و جراحات توصیف‌شده در این شکوائیه شد و مشمول تعریف U.S.C. § 1605A 28 می‌گردد.

**50. Liability for Taliban's Actions:**

خوانده ایران به‌طور مستقیم و غیرمستقیم مسئول اعمال طالبان و عوامل آن است، زیرا حمایت ایران عامل اساسی در توانمندسازی طالبان برای ارتکاب اعمال تروریستی از جمله حمله‌ای که به مرگ کریسی دیویس انجامید، بوده است.

**STATEMENT OF FACTS** — بیانیهٔ حقایق

**OVERVIEW OF IRAN'S MATERIAL SUPPORT FOR THE TALIBAN** — مروری بر حمایت مادی ایران از طالبان

**51.**

ایران به‌صورت فعال و مستمر، حمایت و منابع مادی در اختیار طالبان و شبکه‌های تروریستی وابسته در افغانستان قرار داده است؛ این امر علی رغم ایدئولوژی سنی افراطی طالبان است که به‌طور تاریخی با رژیم شیعی ایران تفاوت دارد.

**52.**

این همکاری بر دشمنی مشترک و تزلزل‌ناپذیر نسبت به ایالات متحده و متحدانش استوار است و اختلاف‌های ایدئولوژیک را در جهت تحقق اهداف راهبردی مشترک کنار می‌گذارد.

**53.**

ایالات متحده و نیروهای ناتو، دولت اسبق افغانستان را مورد حمایت قرار می‌دادند.

**54.**

ایران برای تضعیف آن دولت، به‌طور مداوم طالبان را با منابع مالی قابل‌توجه، سلاح‌های پیشرفته، آموزش جامع و پناهگاه‌های امن تجهیز می‌کرد تا حملات علیه پرسنل و منافع ایالات متحده و نیروهای ائتلاف را امکان‌پذیر و تسهیل کند.

**55.**

گزارشی در والاستریت ژورنال در ژوئن ۲۰۱۵ تنها چند روز پس از مرگ کریسی دیویس بیان داشت که عوامل ایرانی «بی‌سر و صدا میزان تأمین سلاح، مهمات و منابع مالی برای طالبان را افزایش داده‌اند» و حتی به جذب و آموزش جنگجویان طالبان می‌پرداختند.

### 56. Arms Smuggling Network:

ایران با بهره‌گیری از شبکۀ قاچاقچیان، طیف گسترده‌ای از جنگ‌افزار و تجهیزات را به طالبان منتقل کرد؛ از جمله (اما نه محدود به) خمپاره‌های ۸۲ میلی‌متری، راکت‌اندازهای RPG، تفنگ‌های AK-47، مواد لازم برای ساخت بمب‌های دست‌ساز پیشرفته (IED) و دیگر سخت‌افزارهای کشندۀ نظامی که برای واردکردن حداکثر تلفات طراحی شده‌اند.

### 57. Official Confirmation:

مقامات ایالات متحده و افغانستان حمایت گستردۀ ایران از طالبان را تأیید کرده‌اند.

### 58. Pentagon Statement (2019):

در بیانیه‌ای در سال ۲۰۱۹، فرمانده نیروی دریایی، ربکا رباریش (سخنگوی پنتاگون) اعلام کرد: «ایران دست‌کم از سال ۲۰۰۷، زمانی که نیروهای ناتو یک محمولۀ سلاح ارسالی از ایران به مقصد طالبان را توقیف کردند، به طالبان حمایت مادی ارائه کرده است.»

### 59. Details of Iranian Support:

به گفتۀ وی، «حمایت ایران شامل سلاح‌های سبک، مواد منفجره، خمپاره، RPG، تیربارهای سنگین و راکت‌های ۱۰۷ میلی‌متری، افزون بر آموزش تاکتیک‌های واحدهای کوچک و شیوۀ استفاده از سامانه‌های تسلیحاتی» بوده است.

### 60. Sanctuary in Iran:

همچنین ایران برای جنگجویان طالبان در خاک خود پناهگاه فراهم کرده؛ پایگاه‌های عملیاتی امن، پشتیبانی لجستیکی و آزادی جابه‌جایی در اختیارشان گذاشته و رفت‌وآمد آنان به افغانستان و بالعکس را تسهیل نموده؛ چنان‌که خبرنگاران تحقیقی و منابع اطلاعاتی گزارش داده‌اند.

### 61. 107 mm Rockets:

از مهم‌ترین سلاح‌های تحویلی ایران به طالبان، راکت‌های ۱۰۷ میلی‌متری بود؛ سلاح آتش غیرمستقیمی که طالبان بارها و به‌طور مؤثر برای هدف قراردادن پایگاه‌ها و نیروهای امریکایی در افغانستان به کار گرفت و خسارات و تلفات سنگینی وارد ساخت.

### 62. Intent & Knowledge:

این حمایت گسترده با علم صریح و قصد روشن ایران انجام شد تا طالبان از این منابع برای اجرای حملات تروریستی علیه پرسنل و منافع ایالات متحده در افغانستان استفاده کند.

### 63. Iran's Deliberate Support:

ایران با فراهم‌سازی عامدانهٔ سلاح، بودجه و آموزش، توانایی طالبان را برای اجرای حملات مرگبار و ویرانگر از جمله حملهٔ راکتی که جان کریس دیویس را گرفت به‌طور چشمگیری افزایش داد.

حملات طالبان به پایگاه بگرام — **TALIBAN ATTACKS ON BAGRAM AIRFIELD**

### 64. Strategic Target:

پایگاه هوایی بگرام در استان پروان افغانستان یکی از بزرگ‌ترین و راهبردی‌ترین تأسیسات نظامی ایالات متحده بود و همواره هدفی پراهمیت و مکرر برای حملات تروریستی و شورشی طالبان به شمار می‌رفت.

### 65. Indirect-Fire Tactics:

طالبان و شبکهٔ تروریستی وابستهٔ آن (از جمله شبکهٔ حقانی و دیگر گروه‌های شورشی) به‌طور مستمر و کورکورانه حملات آتش غیرمستقیم با راکت و خمپاره علیه بگرام انجام می‌دادند تا تلفات وارد کرده، رعب پراکنده سازند و عملیات نیروهای امریکا، ائتلاف و کارکنان غیرنظامی را مختل کنند.

### 66. Indiscriminate Rocketing:

این حملات راکتی غالباً کورکورانه بود و به‌جای اهداف نظامی معیّن، کل پایگاه را نشانه می‌گرفت؛ بنابراین همهٔ افراد حاضر از جمله سربازان، پیمانکاران غیرنظامی مانند کریس دیویس و کارکنان پشتیبانی در معرض خطر قرار می‌گرفتند.

### 67. Taliban Stronghold in Parwan:

استان پروان، محل استقرار بگرام، در دورهٔ مرتبط با این پرونده به‌عنوان یک پایگاه قدرتمند فعالیت طالبان شناخته می‌شد؛ منابع متعدد (از اطلاعات نظامی امریکا تا مطالعات دانشگاهی) گزارش کرده‌اند که طالبان دست‌کم از ۲۰۰۸ تا ۲۰۱۶ در این منطقه تسلط عملیاتی قابل‌توجهی داشت و می‌توانست حملات را با سهولت نسبی طرح‌ریزی و اجرا کند.

### 68. Public Claims of Responsibility:

طالبان در همان بازهٔ زمانی دست‌کم مسئولیت دو حملهٔ عمده به بگرام را علناً بر عهده گرفت؛ امری که نشان می‌دهد این‌گونه حملات، تاکتیکی شناخته‌شده و پرکاربرد در کارزار وحشت‌آفرینی این گروه بوده است.

**69.** در ژوئن ۲۰۱۳، حدود دو سال پیش از حمله‌ای که جان کریسی دیویس را گرفت، طالبان یک حملهٔ هماهنگ راکتی/خمپاره‌ای علیه پایگاه هوایی بگرام انجام داد که به کشته‌شدن چهار نظامی آمریکایی و وارد آمدن خسارات عمده به پایگاه انجامید.

**70.** تحقیقات جامع بعدی مقامات آمریکایی و احکام صریح دادگاه‌های فدرال ایالات متحده، حملهٔ ۱۸ ژوئن ۲۰۱۳ بگرام را به حمایت مادی ایران پیوند داده و رابطهٔ روشنی میان اقدامات ایران و فعالیت‌های تروریستی طالبان برقرار کرده است.

**71.** کمک ایران به طالبان به‌عنوان علت مستقیم (proximate cause) آن حملهٔ مرگبار ۲۰۱۳ شناخته شد.

**72.** این الگوی تثبیت‌شده و تکرارشونده حملهٔ راکتی طالبان به بگرام که با حمایت ایران تسهیل شده و تلفات آمریکایی در پی داشته به‌طرز نگران‌کننده‌ای با شرایط حملهٔ ۲۰۱۵ به کریسی دیویس مطابقت دارد و نشان‌دهندهٔ الگوی ثابت و مستمر تروریسم مورد حمایت ایران است.

**73.** تا سال ۲۰۱۵، تأمین راکت‌ها، تسلیحات پیشرفته و سایر ادوات جنگی از سوی ایران برای طالبان بدون وقفه ادامه یافته و حتی تشدید شده بود و به‌طور مستقیم و چشمگیری کارزار دائمی ترور طالبان علیه آمریکایی‌ها و منافع ایالات متحده در افغانستان را امکان‌پذیر می‌ساخت.

### THE JUNE 8, 2015, ROCKET ATTACK AND KRISSIE DAVIS' DEATH — حملهٔ راکتی ۸ ژوئن ۲۰۱۵ و مرگ کریسی دیویس

**74.** در اوایل ژوئن ۲۰۱۵، کریسی دیویس به‌عنوان بخشی از مأموریت خود با سازمان تدارکات دفاعی (DLA) در پایگاه بگرام خدمت می‌کرد.

**75.** صبح روز ۸ ژوئن ۲۰۱۵، هنگامی‌که کریسی دیویس با خودرویی در پایگاه به سمت سالن غذاخوری پُلِزِر بگرام در حرکت بود که طالبان حملهٔ راکتی به بگرام انجام داد.

**76.** حدود ساعت ۷:۰۰ صبح به وقت محلی، یک راکت ۱۰۷ میلی‌متری منطبق با سلاح‌هایی که ایران در اختیار طالبان گذاشته بود، به‌دست جنگجویان طالبان شلیک شد به بگرام اصابت کرد.

### 77. Direct Impact Explosion:
راکت به‌طور مستقیم به بخش زیرین وسیلۀ نقلیه‌ای که کریس دیویس در آن سوار بود برخورد کرد و خسارتی فاجعه‌بار به بار آورد.

### 78. Fatal Injuries & Death:
کریس دیویس بر اثر شدت انفجار به‌شدت و به‌طور جبران‌ناپذیری مجروح شد، به تروما ناشی از موج انفجار تسلیم گردید و در همان صحنه جان باخت.

### 79. No Other Casualties:
در این حمله هیچ فرد دیگری آسیب ندید؛ نکته‌ای که دقت مرگبار اصابت راکت به خودروی کریس دیویس و بداقبالی تراژیک و منحصربه‌فردِ قربانی شدن او را برجسته می‌کند.

### 80. Service & Sacrifice:
کریس دیویس، ۵۴ ساله در آن زمان، هنگام خدمت به کشورش در منطقۀ جنگی و به‌عنوان یک پیمانکار غیرنظامی متعهد که در عملیات لجستیکی حیاتی مشارکت داشت، بالاترین بها را پرداخت.

### 81. Part of Terror Campaign:
حملۀ راکتی ۸ ژوئن ۲۰۱۵ که به مرگ کریس دیویس انجامید، بخشی جدایی‌ناپذیر از کارزار تروریستی گستردۀ طالبان بود و با همان نوع سلاحی اجرا شد که ایران به‌طور مستمر در اختیار طالبان قرار می‌دهد.

### 82. 107 mm Rocket Description:
راکت ۱۰۷ میلی‌متری یک پرتابۀ انفجاری با استاندارد نظامی است که برای وارد کردن حداکثر خسارت طراحی شده و به‌طور معمول توسط نیروهای شورشی در افغانستان برای حملات آتش غیرمستقیم استفاده می‌شود.

### 83. Iranian Support: 107 mm Rockets:
حمایت گستردۀ ایران از طالبان، به طور حیاتی، شامل تأمین راکت‌های ۱۰۷ میلی‌متری در کنار سایر سلاح‌ها و کمک‌های مادی بود.

### 84. Deliberate Provision of Lethal Weapon:
ایران با علم و قصد قبلی، همان دسته سلاح مرگبار را در اختیار طالبان قرار داد که سرانجام به‌طور مستقیم برای کشتن کریس دیویس به کار رفت.

### 85. Temporal Proximity to WSJ Report:
این حملۀ مرگبار تنها سه روز پیش از آن روی داد که والاستریت ژورنال به‌طور علنی از افزایش و تداوم حمایت ایران از طالبان گزارش داد که نزدیک بودن زمانی اقدامات ایران و خشونتِ حاصل را برجسته می‌کند.

**86.**

ایران با تشدید و تداوم کمک‌های خود شامل سلاح و بودجه ، درست در همان بازهٔ زمانی، به‌طور مادی و مستقیم توانایی طالبان را برای انجام حملات مرگبار، مانند حملهٔ ویرانگر ۸ ژوئن ۲۰۱۵ در بگرام، افزایش داد.

## CAUSATION – IRAN'S MATERIAL SUPPORT AS A SUBSTANTIAL FACTOR

سببیت ─── حمایت مادی ایران به‌عنوان عامل اساسی

**87.**

مرگ کریسی دیویس نتیجهٔ اعمال هماهنگ طالبان (مجری حمله) و ایران (تسهیل‌کننده و حامی اساسی حمله) بود.

**88.**

حمایت ایران عامل اساسی و مؤثّر در وقوع این حمله به‌شمار می‌رود.

**89.**

سببیت نزدیک (proximate cause) صرفاً به «وجود ارتباط معقولی میان فعل یا ترک فعل خوانده و زیانی که خواهان متحمل شده» نیاز دارد. ( Havlish v. Bin Laden (In re Terrorist Attacks on September 11, 2001), 2011 U.S. Dist. LEXIS 155899, در ص 202 (دادگاه SDNY، ۲۰۱۱) )

**90.**

اگر تأمین گسترده و مداوم منابع حیاتی از جمله تحویل آگاهانه و محتمل همان راکت ۱۰۷ میلی‌متری به‌کاررفته در حمله از سوی ایران نبود، توان طالبان برای شلیک حملات به بگرام با چنین دقت مرگبار و اثر ویرانگر، به‌طور قابل‌توجهی کاهش می‌یافت.

**91.**

ایران با علم و قصد بدخواهانه، حمایت مادی و عمده‌ای به طالبان ارائه کرد؛ با آگاهی روشن از اینکه این کمک مستقیماً برای هدف قرار دادن اتباع ایالات متحده مانند کریسی دیویس که در افغانستان خدمت می‌کردند استفاده خواهد شد.

**92.**

مطابق 28 U.S.C. § 1605A(a)(1) و (a)(2)(A)(ii)، دولت‌های حامی تروریسم خارجی، مانند ایران، صراحتاً از مصونیت در دادگاه‌های آمریکا مستثنا بوده و می‌توانند بابت فراهم‌کردن حمایت مادی یا منابع برای اعمال قتل فراقضایی که موجب صدمه یا مرگ اتباع آمریکا از جمله پیمانکاران دولتی مانند کریسی دیویس می‌شود، مستقیماً مسئول شناخته شوند. ( Owens v. Republic of Sudan، پرونده شماره ۵۱۰۵-۱۴، دادگاه استیناف ناحیهٔ دی.سی.، ۲۰۱۷ )

**93.** اقدامات ایران به‌طور قطعی تمامی عناصر استثنای تروریسم در FSIA را احراز می‌کند: (الف) ایران در زمان حمله دولت حامی تروریسم شناخته‌شده بود و تا امروز نیز چنین است؛ (ب) کریسی دیویس هنگام مرگ، شهروند ایالات متحده و همچنین پیمانکار دولت آمریکا بود که هر دو گروه صراحتاً تحت شمول این قانون قرار دارند ( Owens v. Republic of Sudan، پروندهٔ 5105-14، دیوان استیناف دی‌سی.، ۲۰۱۷)؛ (ج) مرگ کریسی دیویس مستقیماً و به‌صورت سببیت نزدیک ناشی از «قتل فراقضایی» بوده است، تعریفی دقیقاً قانونی برای یک قتل عمدی و غیرقانونی غیرنظامی بدون مجوز هیچ دادگاهی که در A1605§ صراحتاً به مطرح شده است؛ و (د) ایران آگاهانه حمایت یا منابع مادی برای ارتکاب همین قتل فراقضایی را توسط طالبان فراهم کرد (همان مرجع).

**94.** بنابراین، و بدون هیچ تردیدی، ایران طبق حقوق فدرال کاملاً مسئول مرگ غیرقانونی کریسی دیویس است.

**95.** طالبان، به‌عنوان موجودیتی که شخصاً و عمداً حمله راکتی ۸ ژوئن ۲۰۱۵ را اجرا کرد، به همان نسبت و به‌طور مستقل تحت «قانون ضد تروریسم» مسئول مرگ یک تبعهٔ آمریکایی از طریق اقدام آشکار تروریسم بین‌المللی است.

**96.** حمله حساب‌شده به پایگاه بگرام به‌طور قطعی با تعریف مقرر «اقدام تروریسم بین‌المللی» در U.S.C 18 § 2331. مطابقت دارد: عملی خشونت‌آمیز و تهدیدکنندهٔ جان انسان که عمدتاً خارج از خاک ایالات متحده رخ داده است و با هدف مشخص ایجاد رعب یا اجبار جمعیت غیرنظامی و تأثیر مستقیم بر سیاست یک دولت (ایالات متحده و شرکای ائتلافی آن) از طریق ترور یا آدم‌ربایی (در اینجا ترور یک تبعهٔ آمریکایی) و اعمال خشونت‌آمیز انجام شد.

**97.**

به موجب همین عمل شنیع تروریسم بین‌المللی، دارایی (Estate) کریسی دیویس  که متعلق به یک شهروند امریکایی است بهشدت متضرر شده و بنابراین بر اساس (18 U.S.C. § 2333a) دارای سبب دعوای روشن و قابل طرح علیه طالبان است.

**98.**

رفتار فجیع طالبان همچنین بهطور مستقل مصداق مرگ غیرقانونی (Wrongful Death) در حقوق عرفی و سایر تقصیرهای عمدی مرتبط با تروریسم را تشکیل میدهد؛ اموری که برای آنها طالبان هیچگونه مصونیت، توجیه حقوقی یا دفاع معتبری ندارد.

**99.**

طالبان، در همکاری تنگاتنگ و با کمک قابل‌توجه جمهوری اسلامی ایران، در ۸ ژوئن ۲۰۱۵ عمداً یک قتل فراقضایی مرتکب شد که مستقیماً به مرگ غمانگیز کریسی دیویس انجامید.

**100.**

قتل حساب‌شدهٔ کریسی دیویس عملی عامدانه، عمدی و فجیع تروریستی بود که بی‌اعتنایی آشکار به حیات انسان را نشان میدهد.

**101.**

کریسی دیویس، یک غیرنظامی کاملاً بیگناه، همسری فداکار و مادری مهربان بود که شجاعانه داوطلب خدمت در محیطی خطرناک شد و در عملیات لجستیکی حیاتی به امنیت و رفاه کشورش یاری رساند.

**102.**

تأثیر ویرانگر مرگ کاملاً غیرضروری او بر خانوادهٔ بازماندهاش فاجعهبار بوده است رنجی وصف‌ناپذیر و ماندگار که به اندوه عمیق، پریشانی روانی پایدار، خلأ دائمی در همراهی خانوادگی و گسست بافت عاطفی و اجتماعی خانواده انجامیده است.

**103.**

اقدامات خواندگان آشکارا عمدی، بهغایت خبیثانه و نشاندهندهٔ بیپروایی و بیاعتنایی فاحش به حیات انسان و هنجارهای حقوقی تثبیتشده بوده و بدین ترتیب، خواهانها را نه‌تنها مستحق دریافت خسارات جبرانی قابل‌توجه برای صدمات جسمی و... (ادامه در صفحه بعد).

**103.**

اقدامات خواندگان آشکارا عمدی، بهغایت خبیثانه، و نشاندهندهٔ بیپروایی و بیاعتنایی فاحش به حیات انسان و هنجارهای حقوقی تثبیت شده است؛ از اینرو، خواندهها نه تنها مستحق دریافت خسارات جبرانی قابلتوجه برای صدمات جسمی و زیانهای گسترده متحمل شده هستند، بلکه همچنین مستحق دریافت خسارات تنبیهی چشمگیر بهمنظور مجازات و بازدارندگی مؤثر چنین رفتارهای فاحش و غیرانسانی در آینده میباشند.

**104.**

برای پیروزی در دعوای مبتنی بر FSIA، خواندهها باید وجود رابطهٔ سببیت روشن و نزدیک میان حمایت دولتی از تروریسم و عملی خاص که مستقیماً موجب آسیب و مرگ شده است را بهطور قطعی اثبات کنند. دادگاهها پیوسته تصریح کردهاند که در دعاوی تروریسم، سببیت نزدیک صرفاً «وجود ارتباط معقولی میان فعل یا ترک فعل خوانده و خسارات وارده به خواهان» را میطلبد. *Havlish v. Bin Laden* (In re Terrorist Attacks on September 11, 2001), 2011 U.S. Dist. LEXIS 155899, ص 202 (S.D.N.Y. 2011).

## COUNT I: WRONGFUL DEATH AND PERSONAL INJURY (EXTRAJUDICIAL KILLING)

شمارش اول: مرگ غیرقانونی و صدمات جسمی (قتل فراقضایی)

**105.**

خواندهها بدینوسیله هر یک از ادعاهای مطرحشده در بندهای پیشین را به همان قوت و اثر، گویی که بهطور کامل و جداگانه در اینجا بیان شدهاند، مطابق با مواد 28 U.S.C. § 1605A(c) و 18 U.S.C § 2333، وارد و مجدداً طرح میکنند.

**106.**

حملهٔ راکتی حسابشدهٔ ۸ ژوئن ۲۰۱۵ که به شکل تراژیکی جان کریسی دیویس را گرفت، مصداق آشکار قتل فراقضایی بوده، قتلی عمدی و غیرقانونی که هیچ مرجع قضایی صالحی آن را مجاز ندانسته است و دقیقاً در قلمرو استثنای تروریسم FSIA و نیز تعریف TVPA قرار میگیرد. این حملهٔ فجیع عمداً توسط جنگجویان طالبان، بهعنوان بخشی جداییناپذیر از کارزار سازمانیافتهٔ تروریستیشان در هدف قراردادن پرسنل آمریکایی، اجرا شد. 28 U.S.C. § 1350(a)(3)).

**107.**

خوانده، طالبان، با برنامهریزی، هماهنگی، و اجرای عمدی حملهٔ مرگبار راکتی به پایگاه هوایی بگرام که مستقیماً منجر به کشته شدن کریسی دیویس شد، بدون تردید و بهصورت مستقیم مسئول قتل فراقضایی یک شهروند ایالات متحده است.

**108.**

۱۰۸. اقدامات نکوهش‌آمیز طالبان آشکارا عمدی، ذاتاً نادرست و به‌وضوح غیرقانونی بوده و اصول بنیادین حقوق بشر و حقوق بین‌الملل را نقض کرده است.

**109.** This conduct violated numerous international and U.S. laws, including prohibitions on attacks against civilians and civilian objects.

۱۰۹. این رفتار، مقررات متعدد بین‌المللی و قوانین ایالات متحده از جمله ممنوعیت حمله به غیرنظامیان و اهداف غیرنظامی را نقض نموده است.

**110**

۱۱۰. اقدام حساب‌شدهٔ طالبان بی‌تردید یک «عمل تروریسم بین‌المللی» به‌معنای مصرح در U.S.C 18 § 2331 است: عملی خشونت‌آمیز و تهدیدکننده جان انسان که عمداً خارج از خاک آمریکا رخ داد و به‌طور خاص برای ارعاب یا اجبار جمعیت غیرنظامی و تأثیر بر سیاست دولت ایالات متحده و شرکای ائتلافی آن از طریق ترور و اجبار خشونت‌آمیز انجام شده است.

**111.**

۱۱۱. عمل انجام‌شده مطابق با تعریف «تروریسم بین‌المللی» در ماده ۱۸ قانون ایالات متحده، بند ۲۳۳۱، واجد شرایط است. این ماده تروریسم بین‌المللی را به‌عنوان فعالیت‌هایی تعریف می‌کند که:

(A)) شامل اعمال خشونت‌آمیز یا اقداماتی خطرناک برای جان انسان‌ها باشند که قوانین کیفری ایالات متحده یا ایالت‌ها را نقض می‌کنند، یا اگر در حوزه قضایی ایالات متحده یا هر ایالت انجام می‌شدند، جنبه کیفری می‌داشتند؛

(B) به نظر می‌رسد با قصد مشخص زیر انجام شده‌اند:
(i) برای ترساندن یا وادار ساختن جمعیت غیرنظامی؛
(ii) برای تأثیرگذاری بر سیاست‌های یک دولت از طریق ارعاب یا اجبار؛ یا
(iii) برای تأثیرگذاری بر عملکرد دولت از طریق نابودی گسترده، ترور یا آدم‌ربایی؛ و
(C) عمدتاً خارج از ایالات متحده رخ دهند، یا از نظر روش انجام، افرادی که هدف ارعاب یا اجبار قرار گرفته‌اند، یا محل فعالیت یا پناه گرفتن عاملان، مرزهای ملی را درنوردند.

تشخیص اینکه این اقدام مصداق تروریسم بین‌المللی است، بیشتر با استناد به رأی صادره در پرونده *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685 (دادگاه تجدیدنظر حوزه هفتم، 2008) تأیید می‌شود.

**112.**

به‌موجب این عمل تروریسم بین‌المللی، خواهان (اعم از شخص انجلا میچل و به‌عنوان نمایندهٔ دارایی کریسی دیویس، شهروند ایالات متحده) متحمّل خسارات شده است؛ بنابراین طالبان طبق 18 U.S.C. § 2333(a) مسئول جبران تمامی زیان‌های ناشی از این حمله می‌باشد، از جمله خسارات جبرانی و تنبیهی، به‌علاوه هزینهٔ وکلاء و مخارج دادرسی که در بخش راهکارهای مدنی این ماده پیش‌بینی شده است.

**113.**

خواندهٔ «جمهوری اسلامی ایران» از طریق مقامات، عوامل و نهادهای وابستهٔ خود، حمایت و منابع مادّی در اختیار طالبان قرار داد که اساساً قتل فراقضایی کریسی دیویس را تسهیل و امکان‌پذیر ساخت.

**114.**

این حمایت ایران که به‌طور خاص شامل تأمین همان نوع راکت‌های ۱۰۷ میلی‌متری به‌کاررفته در حملهٔ بگرام بود،با علم واقعی یا بی‌اعتنایی عامدانه نسبت به این واقعیت ارائه شده که چنین کمکی برای حملات تروریستی علیه نیروها و پرسنل آمریکا، از جمله پیمانکاران غیرنظامی چون کریسی دیویس، به کار خواهد رفت.

**115.**

حمایت مادّی ایران علت مستقیم (proximate cause) حمله و مرگ کریسی دیویس بود؛ زیرا این حمایت به طالبان امکان داد حملهٔ راکتی را به‌طور مؤثر انجام دهد. طبق 28 U.S.C. § 1605A(a)(1) و (c)، ایران مسئول صدمات و مرگ کریسی دیویس است، زیرا مرگ او ناشی از قتل فراقضایی بود که ایران در آن حمایت مادّی فراهم کرده است ( Owens v. Republic of Sudan، شمارهٔ 5105-14، دادگاه استیناف دی.سی.، ۲۰۱۷).

**116.**

رفتار ایران تمام عناصر لازم برای مسئولیت در § A1605 را احراز می‌کند: (الف) کریسی دیویس در زمان حمله یک شهروند ایالات متحده و پیمانکار دولت امریکا بود (همان مرجع Owens)؛ ب) ایران در آن زمان به‌عنوان یک کشور حامی تروریسم شناخته شده بود و همچنان نیز چنین است؛ و

ج) تأمین منابع مالی، آموزش و تسلیحات توسط ایران برای طالبان، عامل مؤثری در توانمندسازی طالبان برای انجام حمله مرگبار بوده و به‌طور مستقیم باعث مرگ کریسی دیویس شده است.

(*Owens v. Republic of Sudan*, No. 14-5105 (D.C. Cir. 2017)).

**117.**

اقدامات خواندگان شامل طرح‌ریزی، پشتیبانی و اجرای یک حملهٔ تروریستی مرگبار  اعمال و ترک فعل‌های نادرستی بود که مستقیماً موجب مرگ کریسی دیویس شد و پیش از مرگ، صدمات شدید و خشونت فراوانی بر او وارد آورد.

**118.**

کریسی دیویس وحشت و اثر جسمی انفجار راکت را تحمل کرد؛ گرچه بسرعت جان سپرد ولی در لحظات حمله درد و رنجی آگاهانه متحمل شد و از حیات و آیندهٔ خویش محروم گردید و در واپسین لحظات، تمام هول و هراس حمله را تجربه کرد.

**119.**

هرچند مرگ او نسبتاً سریع رخ داد، در همان لحظاتِ حمله درد و رنج هوشیارانه را تحمل نمود و برای همیشه از زندگی و آینده‌اش  از جمله دیدار دوبارهٔ خانواده، جشن موفقیت‌ها و تجربهٔ شادی‌هایی که برایشان سخت کوشیده بود  محروم شد؛ فقدانی عظیم و جبران‌ناپذیر.

**120.**

خواهان، به‌عنوان نمایندهٔ شخصی دارایی کریسی دیویس، تمامی خسارات ممکن بابت مرگ غیرقانونی و دعاوی بقا را مطالبه می‌کند؛ از جمله خسارات درد و رنج، دستمزد و منافع اقتصادی ازدست‌رفته، محرومیت از لذت زندگی و سایر خسارات شخصی که کریسی دیویس پیش از مرگ و در نتیجهٔ مستقیم آن متحمل شد.

**121.**

به سبب اقدامات عمدی و غیرقانونی خواندگان، خواهان‌ها زیان‌های چشمگیری متحمل شده‌اند که طبق 28  U.S.C. §
1605A(c)  شامل غرامت اقتصادی، روحی، درد و رنج و خسارات تنبیهی و نیز تحت 18 U.S.C. § 2333 قابل بازیابی است.

**122.**

دارایی (Estate) کریسی دیویس، به‌نمایندگی از بازماندگان و ورثۀ او از جمله انجلا میچل متحمل زیان‌های اقتصادی چشمگیر (از جمله فقدان درآمد، مزایای شغلی و حمایتی که کریسی دیویس فراهم می‌کرد) و خسارات غیراقتصادی عمیق به‌دلیل مرگ غیرقانونی او شده و همچنان خواهد شد.

**WHEREFORE** — خواسته

خواهان‌ها بدین‌وسیله خواستار صدور حکم علیه خواندگان، «جمهوری اسلامی ایران» و «طالبان»، به‌طور تضامنی و انفرادی، به‌نفع خواهان‌ها هستند؛ برای دریافت خسارات جبرانی قابل‌ملاحظه در مبلغی که متعاقباً توسط کارشناس ویژه (*Special Master*) صندوق *USVSST* تعیین می‌شود، بابت صدمات جسمی و مرگ غیرقانونی کریسی دیویس. این خسارات شامل  ولی نه محدود به  غرامت برای درد و رنج، دست آورد های ازدست‌رفته، محرومیت از لذت زندگی، هزینه‌های درمانی و مراسم تدفین و سایر خسارات بقا و مرگ غیرقانونی، به‌علاوۀ خسارات تنبیهی و هرگونه اقدام جبرانی دیگر که دادگاه مقتضی بداند، می‌گردد.

**COUNT II: LOSS OF SOLATIUM** — شمارش دوم: خسارت سولاتیم (رنج بازماندگان)

**123.**

خواهان‌ها تمامی ادعاهای فوق را عیناً برای به نفع خانوادۀ درجه‌یکِ بازماندۀ کریسی دیویس، بر اساس 28 U.S.C. § 1605A(c) و حقوق عرفی، دوباره طرح و تصدیق می‌کنند.

**124.**

در نتیجۀ مستقیم و سببیت نزدیک اعمال عمدی، غیرقانونی و تروریستیِ خواندگان، اعضای بازماندۀ خانوادۀ کریسی دیویس دچار رنج شدید روانی، درد و رنج عاطفی، و فقدان معاشرت، همراهی، آرامش، مشاوره و حمایتِ کریسی دیویس شده‌اند. کریسی دیویس همسری دوست‌داشتنی، دختری مهربان و مادری محبوب بود.

**125.**

مرگ خشونت‌آمیز او باعث رنج روانی شدید و اندوه عمیق عزیزانش شده و همچنان می‌شود.

**126.**

آن‌ها ناچارند با فقدان دائمی و جبران‌ناپذیر محبت و حضور کریسی دیویس در زندگی خود کنار بیایند.

**127.**

آسیب عاطفی واردشده به خانوادهٔ کریسی دیویس محصول ناخواستهٔ اقدامات خواندگان نبود؛ بلکه وارد آوردن عمدی چنین درد و رنجی پیامدی شناخته‌شده و موردنظر در اعمال تروریستی است.

**128.**

هدف اصلی حملات تروریستی مانند آنچه جان کریسی دیویس را گرفت، تنها آسیب رساندن به قربانیان مستقیم نیست، بلکه ترساندن و ایجاد زخم عاطفی در خانواده‌ها و جوامع آنان نیز هست.

**129.**

بنابراین، خواندگان با اعمال خشونت‌آمیز شدید و هولناک، به‌طور عمدی صدمهٔ روحی به بازماندگان کریسی دیویس وارد کرده و هدف مشخصشان ایجاد وحشت و اندوه گسترده بوده است.

**130.**

ازاین‌رو، خواهان (به‌عنوان دارایی کریسی دیویس و به نمایندگی از خانوادهٔ ردیف اول وی) این دعوی خسارت روحی (سولاتیم) را مطرح می‌کند؛ در دعوی تروریسم FSIA، سولاتیم به جبران رنج روانی و آسیب عاطفی بستگان نزدیک قربانی اشاره دارد.

**131.**

این دعوی بر اساس 28 U.S.C. § 1605A(c) اقامه می‌شود که صراحتاً به بستگان قربانیان متوفی تروریسم دولتی اجازهٔ مطالبهٔ خسارت سولاتیم را می‌دهد؛ یا به‌طور بدیل، تحت حقوق عرفی ایالتی قابل‌اعمال برای مرگ غیرقانونی بازماندگان (مانند حقوق ایالت آلاباما، محل اقامت کریسی دیویس، یا حقوق ناحیهٔ کلمبیا) که امکان جبران فقدان معاشرت و همراهی را فراهم می‌کند.

## 132. WHEREFORE:

بنابراین، خواهان‌ها به‌نمایندگی از اعضای بازماندهٔ خانوادهٔ کریسی دیویس درخواست می‌کنند که علیه خواندگان، به‌میزانی که در دادگاه اثبات خواهد شد، بابت خسارتِ سولاتیم (رنج بازماندگان) از جمله جبران فقدان معاشرت، همراهی، عشق، محبت، راهنمایی و حمایت کریسی دیویس و نیز رنج و اندوه شدید عاطفی آنان و نیز خسارات تنبیهی و هرگونه علاج دیگری که دادگاه عادلانه و مناسب بداند، حکم صادر شود.

## COUNT III: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS — شمارش سوم:

ایراد عمدی رنج عاطفی

## 133. Extreme and Outrageous Conduct:

خواهان‌ها همهٔ ادعاهای پیش‌گفته را با همان قوّت در اینجا تکرار می‌کنند. مطابق 28 U.S.C. § 1605A(c) ‑ یا به‌طور بدیل، حقوق عرفی این دعوی به سبب رفتار بسیار شدید و تکان‌دهندهٔ خواندگان که موجب رنج عاطفی شدید شده است مطرح می‌شود.

## 134. June 8 Attack Details:

در ۸ ژوئن ۲۰۱۵، اعضای طالبان با قصد و نیت خبیثانه، راکتی به پایگاه بگرام شلیک کردند و به‌طور خشونت‌آمیزی وبدون هشدار کریسی دیویس را کشتند که اقدامی تروریستی و عمدی محسوب می‌شود. شلیک راکت به سمت منطقه غذاخوری پایگاه که رفت‌وآمد غیرنظامیان بی‌دفاع در آن معمول است، رفتار فوق‌العاده هولناک و فراتر از هر معیار انسانیت و ادب به‌شمار می‌آید.

## 135. Intent and Disregard:

اقدام طالبان صرفاً ناشی از بی‌احتیاطی نبود؛ بلکه عمداً و با محاسبه انجام شد و بی‌اعتنایی مطلق در حد تحقیر نسبت به جان کریسی دیویس و آسیبی که مرگ او ناگزیر بر خانواده‌اش وارد می‌کرد، نشان داد.

## 136. Iran's Facilitation:

این اعمال با تأمین مالی آگاهانه و ارسال تسلیحات از سوی ایران برای طالبان ممکن و مستقیماً تسهیل شد و بدین‌سان ایران به‌طور مستقیم در این رفتار هولناک دخیل است. ایران کاملاً واقف بود که منابعی که فراهم می‌کند در ارتکاب چنین اعمالی به‌کار خواهد رفت.

**136.**

چنین اعمالی با تأمین مالی و تسلیحاتی عامدانهٔ ایران برای طالبان امکان پذیرشده است و با وجود علم کامل ایران به اینکه این منابع در اعمال تروریستی به کار خواهد رفت، این کشور همچنان به پشتیبانی ادامه داد و بی‌اعتنایی بی‌مهابا و سنگدلانه‌ای به جان، امنیت و سلامت روحی خانواده‌های آمریکایی از خود نشان داد.

**137.**

رفتار خواندگان چنان هولناک و به حدی افراطی بود که از حدود تحمل هر انسان متعارف در یک جامعهٔ متمدن فراتر می‌رود؛ رفتاری واقعاً شنیع و مطلقاً غیرقابل‌تحمل.

**138.**

کشتن مادر و همسری ۵۴ ساله به‌وسیلهٔ راکت، جنایتی است که وجدان بشریت را می‌لرزاند و اصول بنیادی انسانیت را می‌شکند. نقش مستقیم ایران در پشتیبانی مادی و چشمگیر از کارزار تروریستی طالبان، همراه با هدف‌گیری عمدی و خبیثانهٔ آمریکایی‌ها توسط طالبان، مسئولیت تام هر دو خوانده را در این عمل افراطی و هولناک به‌وضوح ثابت می‌کند.

**139.**

در نتیجهٔ مستقیم و قابل پیش‌بینی اعمال تعمدی و تروریستی خواندگان، اعضای خانوادهٔ کریسی دیویس (که این دعوی به نفع آنان طرح شده) دچار رنج عاطفی شدید، از جمله اندوه عمیق، اضطراب و آسیب روانی شده و همچنان رنج می‌برند.

**140.**

بازماندگان کریسی دیویس با آگاهی از شیوهٔ بی‌رحمانه و بی‌معنای قتل او، دچار اندوهی تسکین‌ناپذیر، کابوس‌های مداوم و آسیب روانی مانده‌گار شده‌اند و ناچارند با واقعیت فقدان دائمی و ویرانگر او زندگی کنند.

**141.**

رنج عاطفی وارده به خانوادهٔ کریسی دیویس با دانستن اینکه جان او نه صرفاً از دست رفته، بلکه عمداً در یک اقدام شنیع تروریستی گرفته شده است، به‌مراتب تشدید می‌شود؛ واقعیتی که وحشت، شهرت منفی و آسیب روانی پایدار و بی‌اندازه‌ای بر جای می‌گذارد.

**142.**

در پی قتل او، عزیزان کریسی دیویس دچار افسردگی مداوم، اندوه طاقت‌فرسا، احساس فراگیر خلأ و کاهش چشمگیر لذت زندگی شده‌اند؛ اموری که توانایی آن‌ها را برای عملکرد عادی و حفظ سلامت روان مختل کرده است.

**143.**

خواهان‌ها دعوی ایراد عمدی رنج عاطفی(IIED) ) را بر اساس حقوق ماهوی ناحیهٔ کلمبیا که صراحتاً جبران رنج عاطفی اعضای خانوادهٔ درجه‌یک ناشی از اعمال تروریستی هولناک، مانند قتل عمدی یکی از اعضای خانواده را مجاز می‌داند مطرح می‌کنند و بدین‌وسیله مبنای افزوده‌ای برای مطالبه فراهم می‌آورند. ( *Owens v. Republic of Sudan*, 14-5105 (D.C. Cir. 2017) )

**144.**

رنج عاطفی بازماندگان، اعضا و ورثهٔ کریسی دیویس نه‌تنها شدید و ناتوان‌کننده است، بلکه بسیار فراتر از اندوه معمول همراه هر فوت می‌باشد؛ این آسیب، یک صدمهٔ روانی عمیق، پایدار و دگرگون‌کنندهٔ زندگی است که دقیقاً همان نوع لطمهٔ شدید عاطفی است که قانون در دعاوی IIED به رسمیت شناخته و جبران می‌کند.

**145.**

هر یک از بستگان درجه‌یک کریسی دیویس، از جمله همسر، فرزندان، والدین و سایر خویشاوندان نزدیک، دارای اهلیت قانونی برای طرح دعوی ایراد عمدی رنج عاطفی علیه خواندگان هستند، زیرا بین اعمال تعمدی، غیرقانونی و خبیثانهٔ خواندگان و آسیب عاطفی وارده به خانواده ارتباط مستقیم وجود دارد.

**146.**

در دعاوی تروریسم، بستگان مستقیم متوفی بحق قربانیان مستقیم رفتارهای شدید و تکان‌دهنده محسوب می‌شوند، حتی اگر هنگام حمله در محل حضور نداشته باشند؛ زیرا تروریست‌ها به‌طور خاص قصد دارند به خانواده‌ها آسیب عاطفی شدید و ماندگار وارد کنند.

**147.**

بهموجب U.S.C. § 1605A(c 28)، یک دولت حامی تروریسم خارجی  مانند ایران  بیتردید در قبال ایراد عمدی رنج عاطفی (IIED) که خانوادهٔ قربانی به سبب حمایت مادی آن دولت از تروریسم متحمل شدهاند، مسئول است.

**148.**

بههمین ترتیب، طالبان، بهعنوان مرتکب مستقیم حمله، طبق قوانین قابل اعمال  از جمله مسئولیت مستقیم تحت «قانون ضد تروریسم» 18 U.S.C § 2333 بابت ارتکاب عمل تروریسم بینالمللی که رنج عاطفی شدید ایجاد کرده، در قبال این خانواده مسئول است.

**149. WHEREFORE** — خواسته:

بنابراین، خواهانها با احترام درخواست میکنند که دادگاه علیه خواندگان حکم به پرداخت خسارات جبرانی در مبلغی صادر کند که برای جبران کامل و عادلانه رنج عاطفی شدید، اندوه عمیق و آسیب روانی ماندگار وارد بر خانوادهٔ کریسی دیویس به دلیل رفتار هولناک و فجیع خواندگان کافی باشد؛ مبلغ دقیق در جلسهٔ رسیدگی تعیین خواهد شد. افزون بر آن، خسارات تنبیهی و هرگونه جبران دیگر که دادگاه مقتضی و عادلانه بداند، مطالبه میشود.

**COUNT IV: PUNITIVE DAMAGES** — شمارش چهارم: خساراتِ تنبیهی

**150.**

خواهانها همهٔ ادعاهای پیشگفته را تحت U.S.C. § 1605A(c 28) و 18 U.S.C § 2333 با همان قوّت و اثر در این بخش علیه تمام خواندگان تکرار و تصدیق میکنند.

**151.**

اقدامات خواندگان نهتنها عامدانه و خبیثانه بود، بلکه بیپروایی و بیاعتنایی ویرانگر و خطرناک نسبت به حیات انسان، حاکمیت قانون و اصول بنیادین عدالت را نشان داد.

**152.**

ایران و طالبان یک کارزار تروریستی عمدی و مستمر به راه انداختند و بی‌رحمانه افراد بی‌گناه را هدف قرار دادند تا با قتل، آشوب و وحشت فراگیر، اهداف افراطی خود را پیش ببرند.

**153.**

چنین اعمال نکوهش‌آمیزی نه‌تنها موازین حقوقی داخلی و بین‌المللی را نقض می‌کند، بلکه اصول کرامت انسانی، امنیت و رفتار متمدنانه را به‌طور بنیادین تضعیف می‌سازد.

**154.**

این رفتار افزون بر ماهیت مجرمانه، هولناک و افراطی خود، توهینی عظیم به عدالت و انسانیت محسوب می‌شود.

**155.**

تداوم حمایت و ارتکاب اعمال تروریستی خواندگان که حملهٔ بی‌رحمانه منجر به مرگ کریسی دیویس نمونهٔ بارز آن است باید بی‌هیچ ابهامی به‌عنوان نمونه‌ای روشن به جهانیان نشان دهد که این دادگاه تحت هیچ شرایطی اقدامات تروریستی و کسانی را که آن را امکان‌پذیر، تأمین مالی یا پشتیبانی می‌کنند، تحمل نخواهد کرد.

**156.**

اعطای خسارات تنبیهی در این پرونده نه‌تنها به‌طور کامل از نظر قانون مجاز است، بلکه برای مجازات مؤثر خواندگان بابت اعمال فجیعشان و ایجاد بازدارندگی قوی لازم است تا از طرح و پشتیبانی مجدد اقدامات تروریستی علیه آمریکایی‌ها یا هر غیرنظامی بی‌گناه دیگر جلوگیری شود.

**157.**

حق خصوصی اقدام در FSIA صراحتاً امکان دریافت خسارات تنبیهی از دولت‌های حامی تروریسم، مانند ایران، را فراهم می‌کند.

**158.**

«قانون ضد تروریسم» (ATA) نیز تحمیل خسارات تنبیهی/مثالی به‌صورت سه‌برابر کردن خسارات را علیه مرتکبان اعمال تروریسم بین‌المللی مجاز دانسته (و در واقع طبق 18 U.S.C. § 2333(a) سه‌برابر کردن خسارات را الزام دارد.

**159.**

این جنبهٔ الزامی سه‌برابر شدن خسارات نشان‌دهندهٔ قصد کنگره برای مجازات شدید اعمال تروریستی و تأمین حداکثر جبران برای قربانیان است.

**160.**

خسارات تنبیهی به‌طور خاص و به‌شدت علیه ایران موجه است، زیرا این کشور با رفتاری فاحش و مستمر، سال‌ها به‌طور مادی فعالیت‌های تروریستی طالبان را تقویت کرده و بی‌اعتنایی سنگدلانه و مداومی نسبت به جان و امنیت شهروندان آمریکایی از خود نشان داده است.

**161.**

این بی‌اعتنایی عمیق، با ادامه و پایداری حمایت ایران علی‌رغم آگاهی کامل از هدف‌گیری خشونت‌آمیز آمریکایی‌ها توسط طالبان، به‌نحو غیرقابل انکاری تأیید می‌شود.

**162.**

خسارات تنبیهی به‌طور کامل علیه طالبان نیز موجه است تا بی‌پروایی و قصد خبیثانهٔ این گروه نسبت به حیات انسان کیفر داده شود، اعمال تروریستی آن محکوم گردد و هشداری قاطع و بی‌چون‌وچرا برای این گروه و تمامی سازمان‌های تروریستی جهان صادر شود.

**163.**

هر یک از خواندگان با سوء نیت واقعی، قصد عمدی و بی‌احتیاطی افراطی عمل کردند؛ امری که نه‌تنها اعطای خسارات تنبیهی را مثالی یا توجیه، بلکه آن را الزامی می‌کند.

**164.**

حمایت آگاهانه و مستمر ایران از کارزار تروریستی‌ای که قتل حساب‌شدهٔ شهروندان آمریکایی را در بر می‌گیرد، و قتل از پیش طراحی‌شده و بی‌رحمانهٔ کریسی دیویس توسط طالبان، نشان‌دهندهٔ بی‌ارزش شمردن کامل حیات انسان، هنجارهای بین‌المللی و اصول بنیادین عدالت است.

**165.**

اعطای خسارات تنبیهی مناسب و قابل‌توجه، این خواندگان را به‌دلیل رفتار فجیع و نکوهیدهٔ خود به‌طور مؤثر مجازات کرده و پیامی روشن، بی‌تردید و رسا به جهان خواهد فرستاد که حمایت از تروریسم یا ارتکاب اعمال تروریستی علیه آمریکایی‌ها با شدیدترین و گسترده‌ترین مجازات‌های مدنی روبه‌رو خواهد شد.

**166. WHEREFORE:**

بنابراین، خواهان‌ها مصرّانه تقاضا دارند خسارات تنبیهی علیه خواندگان، به‌طور تضامنی و انفرادی، در مبلغی به‌اندازه‌ای تعیین شود که نه‌تنها آنان را به‌سبب رفتار عامدانه و خبیثانهٔ خویش به‌شدت مجازات کند، بلکه آنان و دیگران را نیز از ارتکاب رفتار مشابه در آینده بازدارد. مبلغ مذکور باید بر پایهٔ ادلّهٔ ارائه‌شده در دادگاه و کاملاً مطابق با 28 U.S.C. § 1605A(c) که صراحتاً خسارات تنبیهی علیه دولت‌های حامی تروریسم را مجاز می‌داند و نیز مقرّرهٔ الزامی سه‌برابر شدن خسارات در 18 U.S.C. § 2333(a) تعیین گردد تا خواندگان به‌عنوان نمونه عبرت‌آور روشن شوند که حمایت و ارتکاب اعمال تروریستی علیه شهروندان ایالات متحده ناگزیر با پیامدهای مالی سنگین و ویرانگری همراه خواهد بود.

## PRAYER FOR RELIEF — تقاضای صدور حکم

**167.**

بنابر مراتب پیش‌گفته، خواهان‌ها با احترام از این دادگاه والا می‌خواهند که به نفع ایشان و علیه خواندگان، «جمهوری اسلامی ایران» و «طالبان»، به‌طور تضامنی و غیر تضامنی، احکام زیر را صادر فرماید:

**168.**

صدور حکم علیه ایران مبنی بر مسئولیت آن طبق 28 U.S.C. § 1605A(c).

**169. Compensatory Damages:**

اعطای خسارات جبرانی به خواهان‌ها جهت جبران تمامی زیان‌های قانونی قابل بازیابی، از جمله ولی نه محدود به غرامت بابت درد جسمانی، رنج و آزار عاطفی و پریشانی روانی که کریسی دیویس پیش از مرگش متحمّل شد؛ فقدان حمایت و خدمات اقتصادی گذشته و آینده ناشی از مرگ وی و رنج روانی، اضطراب عاطفی و خسارت روحی (سولاتیم) که اعضای بازماندهٔ خانواده تجربه کرده‌اند. مبلغ مشخص این خسارات بر اساس شواهد ارائه‌شده در جلسهٔ رسیدگی تعیین خواهد شد.

### 170. Solatium Damages:

خسارت سولاتیم: پرداخت غرامت به خانوادهٔ نزدیک بازماندهٔ کریسی دیویس بابت فقدان معاشرت، همراهی، محبت، عاطفه، راهنمایی و حمایت او، تا عادلانه رنج عاطفی و فقدان عمیقی را که متحمل شده‌اند جبران کند؛ مبلغ مشخص این خسارات در دادگاه و براساس ادلهٔ مرتبط با رنج و فقدان آنان تعیین خواهد شد.

### 171. Punitive/Exemplary Damages:

خسارت تنبیهی/مثالی: اعطای خسارات تنبیهی به خواهان‌ها علیه خواندگان در مبلغی که برای مجازات رفتار فاحش، عامدانه و خبیثانهٔ خواندگان، بازدارندگی آنان و دیگران از ارتکاب چنین اعمالی در آینده، و انعکاس شدت اقداماتشان کافی باشد؛ مطابق با 28 U.S.C. § 1605A(c) و سایر قوانین قابل‌اعمال.

### 172.

خواهان‌ها با احترام پیشنهاد می‌کنند که مبلغ خسارات تنبیهی در سطحی تعیین شود که نشان‌دهندهٔ خطای فاحش خواندگان، ضرورت ارسال پیام روشن مبنی بر عدم تحمل تروریسم دولتی و اعمال تروریستی از سوی جامعهٔ متمدن، و لزوم بازدارندگی دیگر مرتکبان بالقوه باشد.

### 173. Pre- and Post-Judgment Interest:

پرداخت بهرهٔ قبل از صدور حکم از ۸ ژوئن ۲۰۱۵ تا تاریخ صدور حکم، و بهرهٔ بعد از صدور حکم، از آن پس، به بالاترین نرخ مجاز قانونی، تا ارزش زمانی خسارات جبران‌شده و تأخیر در دریافت غرامت به‌طور کامل جبران گردد.

### 174. Attorneys' Fees and Costs:

پرداخت هزینه‌های این دعوی، شامل حق‌الوکالهٔ معقول و تمام مخارج مرتبط، به خواهان‌ها؛ طبق 18 U.S.C. § 2333(a) و سایر مقررات قابل‌اعمال، که هزینهٔ اقامهٔ دعوی، حق‌الزحمهٔ کارشناسان، مخارج تحقیق و حق‌الوکالهٔ وکلا را در بر می‌گیرد.

**Any Further Relief:**

اعطای هرگونه و سایر تسهیلاتی که دادگاه با توجه به اوضاع و احوال عادلانه و مناسب تشخیص دهد، از جمله ولی نه محدود به جبران منصفانه (Equitable Relief)، صدور حکم اعلامی (Declaratory Relief)، و اجازه اصلاح این دادخواست در صورت اقتضای عدالت، تا جبران کامل صدمات و خسارات خواهان‌ها تضمین شود.

**Dated:**

تاریخ: ۱۰ ژوئن ۲۰۲۵

**Respectfully submitted,**

با احترام تقدیم می‌شود،

/s/ Jon D. Pels

جون دی. پلز، وکیل —    **Jon D. Pels, Esq.**

ماریا ال. اولسن، وکیل —    **Maria L. Olsen, Esq.**

The Pels Law Firm

4845 Rugby Ave., 3rd Floor

Bethesda, MD 20814

jpels@pelslaw.com

molsen@pelslaw.com

*Chrystan Carlton*

کریستن کارلتون، وکیل —    **Chrystan Carlton, Esq.**

IL Bar No. 6305191))

Carlton Law, Ltd.

77 West Wacker Dr, Suite 4500

Chicago, IL 60601, USA

Tel: (312) 265-7320

chrystan@carltonlawltd.com

درخواست پذیرش در دست بررسی —    **Admission application pending**